[S.F. No. 24622. Dec. 22, 1983.]

RICHARD JOSEPH BURG, Plaintiff and Appellant, v.
THE MUNICIPAL COURT FOR THE SANTA CLARA COUNTY
JUDICIAL DISTRICT OF SANTA CLARA COUNTY,
Defendant and Respondent.
THE PEOPLE, Real Party in Interest and Respondent.

**COUNSEL**

Perry E. Olsen and Thomas P. House for Plaintiff and Appellant.

W. Scott Quinlan, Quinlan, Kershaw, Fanucchi & Hoffman, Owen P. Rafferty, Philip A. Rafferty, Linda Lee DeMetrick and Campbell & DeMetrick as Amici Curiae on behalf of Plaintiff and Appellant.

No appearance for Defendant and Respondent.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R. Granucci and Herbert F. Wilkinson, Deputy Attorneys General, for Real Party in Interest and Respondent.

**OPINION**

**MOSK, J.**—Richard Joseph Burg, hereafter defendant, appeals from a judgment denying his petition for a writ of prohibition. He contends that

Vehicle Code section 23152, subdivision (b),[1] fails to give constitutionally adequate notice of the conduct it prohibits, and that the municipal court erred in overruling his demurrer to that effect. We conclude that section 23152, subdivision (b), is constitutional, and therefore affirm the judgment.

Defendant was arrested at 2:25 in the morning of March 27, 1982, for violation of section 23152, subdivision (a) (driving while under the influence of alcohol). A chemical test administered 50 minutes later revealed a blood-alcohol content of 0.23 percent. He was charged with violating section 23152, subdivision (b), i.e., driving a vehicle while having 0.10 percent or more, by weight, of alcohol in one's body. The complaint also alleged a prior conviction of former section 23102, subdivision (a) (driving while under the influence of alcohol).

Defendant demurred on the ground that section 23152, subdivision (b), gives constitutionally inadequate notice of the conduct proscribed. The municipal court overruled his demurrer, and defendant sought a writ of prohibition in the superior court. The petition was denied on the merits, and this appeal followed.[2]

## I. BACKGROUND

### A. The Problem

Eighty years ago an editorialist complained, "Inebriates and moderate drinkers are the most incapable of all persons to drive motor wagons. The general palsy and diminished power of control of both the reason and the senses are certain to invite disaster in every attempt to guide such wagons." (26 Q.J. Inebriety (1904) 308, 309.) In the ensuing decades motor vehicles have become faster, heavier, and ubiquitous, with proportionately tragic consequences to the victims of drinking drivers. Nearly half of the traffic deaths in California between 1976-1980 involved drinking drivers. (Cal. Highway Patrol, 1980 Ann. Rep., Fatal & Injury Motor Vehicle Traffic Accidents, p. 2, tables 1a, 1b, and p. 58, tables 6a, 6b.) Nearly one-quarter of all traffic accidents resulting in injury involved the use of alcohol. (*Id.*, at p. 3, tables 1c, 1d, and p. 58, tables 6a, 6b.) Traffic deaths in the United States exceed 50,000 annually, and approximately one-half of those fatalities are alcohol-related. (U.S. Dept. Transp., 1977 Highway Safety Act Rep., Appen. A-9, table A-1; cf. Jones & Joscelyn, Alcohol and Highway

---

[1] All statutory references are to the Vehicle Code unless otherwise indicated.

[2] We note that as of January 1, 1983, appeal is no longer available in these circumstances. (Code Civ. Proc., § 904.1; see generally, *Gilbert* v. *Municipal Court* (1977) 73 Cal.App.3d 723, 728-736 [140 Cal.Rptr. 897].)

Safety 1978: A Review of the State of Knowledge (U.S. Dept. of Transp. 1978) pp. 11-26.)

The drunk driver cuts a wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California and the nation. The monstrous proportions of the problem have often been lamented in graphic terms by this court and the United States Supreme Court. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 898-899 [157 Cal.Rptr. 693, 598 P.2d 854]) [quoting U.S. Dept. Health, Ed. & Welf., 3d Special Rep. U.S. Cong. on Alcohol and Health (1978)]; *South Dakota* v. *Neville* (1983) 459 U.S. 553, 558 [74 L.Ed.2d 748, 755, 103 S.Ct. 916, 920] [describing the "tragic frequency" of the "carnage caused by drunk drivers"]; *Mackey* v. *Montrym* (1979) 443 U.S. 1, 17-18 [61 L.Ed.2d 321, 334, 99 S.Ct. 2612].) As observed in *Breithaupt* v. *Abram* (1957) 352 U.S. 432 [1 L.Ed.2d 448, 77 S.Ct. 408], "[t]he increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield." (*Id.,* at p. 439 [1 L.Ed.2d at p. 453].) Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were killed than in the bloodiest year of the Vietnam War. (Compare Cal. Highway Patrol, 1980 Ann. Rep., Fatal & Injury Motor Vehicle Traffic Accidents, p. 2, tables 1a, 1b, 1c, 1d, and p. 58, tables 6a, 6b, with Statistical Abstract of U.S. (103d ed. 1982) p. 361, tables 598, 599.) Given this setting, our observation that "[d]runken drivers are extremely dangerous people" (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890, 899) seems almost to understate the horrific risk posed by those who drink and drive.

*B. The Legislative Response*

Recognizing the effect of alcohol on drivers, state legislatures early in the century attempted to regulate such conduct. Because "both popular and legal views of the problem centered on the grossly intoxicated driver" (Ross, Deterring the Drinking Driver (1982) p. 2), the laws also reflected that conception. Thus, California's first statute on the topic read simply, "No *intoxicated* person shall operate or drive a motor vehicle or other vehicle upon any public highway within this state." (Italics added.) (Stats. 1913, ch. 326, § 17, p. 646.)

A more satisfactory means of defining the problem of drinking and driving emerged in the middle decades of this century, with the development of scientific measurement of blood-alcohol levels. (Ross, Deterring the Drinking Driver (1982) p. 2; Cameron, *The Impact of Drinking-Driving Countermeasures: A Review and Evaluation* 1979 Contemp. Drug Prob. 495,

497-498.) Research on alcohol's effect on both motor skills and judgment revealed that impairment occurred at alcohol concentrations as low as 0.05 percent (Hurst, *Estimating the Effectiveness of Blood Alcohol Limits* (1970) 1 Behav. Research Highway Safety 87), considerably below the point at which typical clinical symptoms of intoxication appear in most persons. (Ross, Deterring the Drinking Driver (1982) p. 2; Jones & Joscelyn, Alcohol and Highway Safety 1978, *op. cit. supra,* at pp. 35-50.) Thus, in 1969, after a number of intervening amendments that attempted to refine definitions and specified penalties, California's "driving under the influence" statute (former § 23102) was fortified by the addition of former section 23126, which created a presumption of being under the influence if a driver had 0.10 percent or more by weight of alcohol in his blood. (Stats. 1969, ch. 231, § 1, p. 565.) By 1972, 47 states had similar statutes. (Murray & Aitken, *The Constitutionality of California's Under-the-Influence-of-Alcohol Presumption* (1972) 45 So.Cal.L.Rev. 955, 958, fn. 8.)

Even these laws, which considerably assisted the prosecution of "driving under the influence" cases, proved inadequate in many respects. Under them, the ultimate question was defined in terms of the defendant's subjective behavior and condition: "Was the defendant under the influence at the time he drove?" Celerity and certainty of punishment were frustrated by the ambiguity of the legal criteria; no matter what his blood-alcohol level, a defendant could escape conviction merely by raising a doubt as to his intoxication. (*People* v. *Lachman* (1972) 23 Cal.App.3d 1094, 1097 [100 Cal.Rptr. 710]; *People* v. *Schrieber* (1975) 45 Cal.App.3d 917, 923 [119 Cal.Rptr. 812]; Cameron, *The Impact of Drinking-Driving Countermeasures: A Review and Evaluation* (1979) Contemp. Drug Prob. 495, 510-511.)

In response to this continuing problem, in the past decade most states enacted additional legislation supplementing existing "driving under the influence" statutes and fashioned after what has been termed the "Scandinavian model." (Ross, Deterring the Drinking Driver (1982) pp. 21-70; Ross, *The Scandinavian Myth: The Effectiveness of Drinking-and-Driving Legislation in Sweden and Norway* (1975) 4 J. Legal Stud. 285; Snortum, *Alcohol-Impaired Driving in Norway and Sweden: Another Look at "The Scandinavian Myth"* (1984) 6 Law & Policy 5; Snortum, *Controlling the Alcohol-Impaired Driver in Scandinavia and the U.S.: Simple Deterrence and Beyond* (1984) 12 J.Crim.Just. 331; Votey, *Scandinavian Drinking-Driving Control: Myth or Intuition?* (1982) 11 J. Legal Stud. 93.) These statutes—which are most frequently subdivisions of a general "driving and alcohol" statute—define the substantive offense not by the subjective term "driving under the influence," but instead as the act of driving with a specified blood-alcohol level. (Macdonald & Wagner, Rep., Nat. Study of Preliminary

Breath Test (PTB) and Illegal per se Laws (U.S. Dept. of Transp. 1981) (Executive Summary) p. xv.) Under these laws, proof of being "under the influence" is unnecessary. The statutes represent a legislative determination that public safety is endangered when a person drives a motor vehicle while having a specified percentage (typically 0.10) or more by weight of alcohol in his blood.

## II. SECTION 23152, SUBDIVISION (b)

As noted, former section 23102 made it illegal to drive while under the influence of alcohol. Conviction required a showing that alcohol had "so far affected the nervous system, the brain, or muscles as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties." (Italics deleted.) (*Byrd* v. *Municipal Court* (1981) 125 Cal.App.3d 1054, 1058 [178 Cal.Rptr. 480].) As explained above, prosecution under this section was facilitated by former section 23126, which established a presumption that a person with a blood alcohol level of 0.10 or more was under the influence of alcohol. (*People* v. *Schrieber, supra,* 45 Cal.App.3d 917, 923.)

In an attempt to address the continuing threat to public safety posed by drinking drivers, in 1981 the Legislature retained the "driving under the influence" statute, renumbered it section 23152, subdivision (a), and added the statute at issue here, section 23152, subdivision (b), which provides: "It is unlawful for any person who has 0.10 percent or more, by weight, of alcohol in his or her blood to drive a vehicle. [¶] For purposes of this subdivision, percent, by weight, of alcohol shall be based upon grams of alcohol per 100 milliliters of blood."

At the urging of Congress,[3] statutes of this kind have recently been enacted in 28 states and the District of Columbia. Depending on the statutory scheme, these enactments create either a new offense,[4] or an alternative

---

[3]23 United States Code Annotated, section 408(e)(1)(C) (making enactment of a 0.10 percent blood-alcohol law mandatory for any state wishing to receive federal highway funds to support alcohol traffic safety programs).

[4]Alabama (Ala. Code, tit. 32-5A-191 (a)(1)); Arizona (Ariz. Rev. Stats. Ann., § 28-692 (B)); Arkansas (Ark. Stat. § 75-2503 (b)); Connecticut (Conn. Gen. Stats. Ann., § 14-227a (g)); Colorado (Colo. Rev. Stats., tit. 42-4-1202 (1.5) (a) (0.15 percent)); Florida (Fla. Stats. Ann., § 316.028 (3)); Illinois (Ill. Rev. Stat., ch. 95 1/2, § 11-501 (1)); Iowa (Iowa Code Ann., § 321.281 (1)(b) (0.13 percent)); Maine (Me. Rev. Stats., tit. 29, § 1312-B (1B), (2C)); Michigan (Mich. Stat. Ann., § 9.2325 (2)); Missouri (Mo. Rev. Stats., § 577.012 (1)); Nebraska (Rev. Stats. Neb., § 39.669.07); North Dakota (N.D., Cent. Code § 39-08-01(1)(a) & (2)(a)); Oklahoma (Okla. Stat. Ann., tit. 47, § 11-902 (A)(1)); Pennsylvania (75 Pa. C. Stats. Ann., § 3731 (a)(4)); South Dakota (S.D. Codified Laws, § 32-23-1 (1)); Utah (Utah Code Ann., § 41-6-44(1) (0.08 percent)); Vermont (Vt. Stats. Ann., tit. 23, § 1201 (a)(1)); Wisconsin (Wis. Stats. Ann., § 346.63 (1)(b)); District of Columbia (D.C. Code, § 40-716 (b)(1)).

definition of "driving under the influence,"[5] or a lesser included offense within driving under the influence.[6] ■ Our statute establishes a new and separate offense. *(Wallace* v. *Municipal Court* (1983) 140 Cal.App.3d 100, 108 [189 Cal.Rptr. 886]; McKinley, *Proving a Violation of Vehicle Code Section 23152 (b): Rabbit Tracks in the Snow or Russian Roulette?* (1982) 5 Crim.Just.J. 223, 224; Comment, *Driving with 0.10 % Blood Alcohol: Can the State Prove It?* (1982) 16 U.S.F.L.Rev. 817, 817.)

■ Contrary to assertions by amici curiae, some commentators,[7] and one court,[8] section 23152, subdivision (b), does not create a conclusive presumption of intoxication, nor does it "eliminate[] the prosecutor's burden of proof when the accused is found to have [0.10] percent, by weight, of alcohol in [his] blood."[9] Instead, the statute defines, in precise terms, the conduct proscribed. In other states that have enacted a statute similar to section 23152, subdivision (b), the courts have drawn the same conclusion, notably the Washington Supreme Court which declared, "The statute does not presume, it defines." *(State* v. *Franco* (1982) 96 Wash. 816 [639 P.2d 1320, 1323]; see also *State* v. *Abbott* (1973) 15 Ore.App. 205 [514 P.2d 355, 357] [question is not whether defendant is intoxicated, but whether he had the specified level of alcohol in his blood]; *State* v. *Gerdes* (S.D. 1977) 252 N.W.2d 335, 335-336 [by proscribing driving with 0.10 percent blood alcohol, the legislature is "stating an offense"]; cf. *People* v. *Dillon* (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697] [Pen. Code, § 189 does not presume malice, it defines first degree felony murder as an offense in which malice is not an element].)

Although under section 23152, subdivision (b), it is no longer necessary to prove that the defendant was in fact under the influence, the People still must prove beyond a reasonable doubt that at the time he was driving his blood alcohol exceeded 0.10 percent. ■ ■ ■ *(People* v. *Lujan, supra,* 141 Cal.App.3d Supp. 15, 22 [the People must prove beyond a reasonable doubt that the defendant was driving a vehicle in any area open to the public, and his blood-alcohol level was 0.10 percent or more at the time

[5]Alaska (Alaska Stats., § 28.35.030 (a)); Delaware (Del. Code Ann., tit. 21, § 4176 (a)); New York (N.Y. Stats., Veh. & Traffic, § 1192 (2)); Oregon (Ore. Rev. Stats., §§ 487.540, 487.545 (0.08 percent)); Rhode Island (Gen. Laws R.I., § 31-27-2(b)); Texas (Tex. Rev. Civ. Stat. Ann., art. 6701*l*-1 (2)(b)); Washington (Rev. Code Wash. Ann., § 46.61.502 (1)).

[6]North Carolina (Gen. Stats. N.C., § 20.138(b)). In West Virginia, although driving with 0.10 percent blood alcohol is not itself a crime, it is the basis for mandatory license revocation if the defendant is also convicted of driving while intoxicated. (W.Va. Code, § 17c-5A-1.)

[7]E.g., Scherotter, *California Vehicle Code Section 23152 (b): A Guessing Game for California Drivers* (1982) 5 Crim.Just.J. 249, 257-261.

[8]*People* v. *Lujan* (1983) 141 Cal.App.3d Supp. 15, 22 [192 Cal.Rptr. 109].

[9]*Review of Selected 1981 California Legislation* (1982) 13 Pacific L.J. 785, 795.

of the alleged offense]; accord, *Greaves* v. *State* (Utah 1974) 528 P.2d 805, 807-808; *Coxe* v. *State* (Del. 1971) 281 A.2d 606, 607; *State* v. *Gerdes, supra,* 252 N.W.2d 335, 336; *Van Brunt* v. *State* (Alaska App. 1982) 646 P.2d 872, 873; cf. *State* v. *Basinger* (1976) 30 N.C.App. 45 [226 S.E.2d 216, 219].)[10]

## III. Constitutional Issues

### A. Police Power

■ We have previously observed that "the area of driving is particularly appropriate for extensive legislative regulation, and that the state's traditionally broad police power authority to enact any measure which reasonably relates to public health or safety operates with full force in this domain." (*Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70, 74 [177 Cal.Rptr. 566, 634 P.2d 917]; accord, *Escobedo* v. *State of California* (1950) 35 Cal.2d 870, 876 [222 P.2d 1] ["usage of the highways is subject to reasonable regulation for the public good"]; *Watson* v. *Division of Motor Vehicles* (1931) 212 Cal. 279, 283 [298 P. 481] [legislative power to regulate travel over highways for general welfare is extensive, and may be exercised in any reasonable manner]; *Mackey* v. *Montrym, supra,* 443 U.S. 1, 17 [61 L.Ed.2d 321, 334] [state has great leeway in adopting summary procedures to protect public health and safety from drunk drivers]; *State* v. *Melcher* (1982) 33 Wn.App. 357 [655 P.2d 1169, 1170] [all presumptions favor legislation that promotes public health and safety and is rationally related to regulation of drinking drivers]; cf. *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].)

---

[10]Section 23152, subdivision (b), prohibits driving a vehicle with a blood-alcohol level of 0.10 percent or higher; it does not prohibit driving a vehicle when a subsequent test shows a level of 0.10 percent or more. Circumstantial evidence will generally be necessary to establish the requisite blood-alcohol level called for by the statute. A test for the proportion of alcohol in the blood will, obviously, be the usual type of circumstantial evidence, but of course the test is not conclusive: the defendant remains free to challenge the accuracy of the test result, the manner in which it was administered, and by whom. (*People* v. *Lewis* (1983) 148 Cal.App.3d 614, 620 [196 Cal.Rptr. 161]; accord, *Fuenning* v. *Superior Court* (Ariz. 1983) 680 P.2d 121, 127 (Dec. 15, 1983, No. 17049-SA) [rejecting argument that analogous statute represents "substitution of a machine test result for a jury verdict" because defendant is given an opportunity to challenge accuracy of test result, and state must prove beyond a reasonable doubt that defendant's blood-alcohol level was 0.10 percent at the time he was driving]; *Cooley* v. *Municipality Anchorage* (Alaska App. 1982) 649 P.2d 251, 254-255.) Of course, both parties may also adduce other circumstantial evidence tending to establish that the defendant did or did not have a 0.10 percent blood-alcohol level while driving. (See, e.g., *Fuenning, supra,* at p. 130.)

We also observe that the present case represents a facial attack on the statute following overruling of a demurrer. We therefore need not consider to what extent in particular cases fundamental notions of due process would permit a defendant to show, for example, that he did not knowingly or voluntarily drive or consume alcohol.

■ "The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute." (*Hale* v. *Morgan, supra,* at p. 398.) ■ Surely the regulation of drinking drivers in a state that experienced 338,344 arrests for "drunk driving" in 1982[11] is well within the legitimate police power of the Legislature. (Accord, *State* v. *Franco, supra,* 639 P.2d 1320, 1324 [upholding legislation analogous to § 23152, subd. (b)]; *Greaves* v. *State, supra,* 528 P.2d 805, 807 [same]; *Roberts* v. *State* (Fla. 1976) 329 So.2d 296, 297 [same]; *State* v. *Basinger* (1976) 30 N.C.App. 45 [226 S.E.2d 216, 218-219] [same].) Scientific evidence and sad experience demonstrate that any driver with 0.10 percent blood alcohol is a threat to the safety of the public and to himself. (Gray, Attorney's Textbook of Medicine (3d ed. 1983) ¶¶ 133.52-133.52 (3) [all individuals suffer impairment at 0.10 percent blood-alcohol content]; *State* v. *Franco, supra,* 639 P.2d 1320, 1322 [abundant scientific evidence that at 0.10 percent blood alcohol all persons are significantly affected and will have lost at least one-quarter of their normal driving ability]; *People* v. *Lewis* (1983) 148 Cal.App.3d 614, 617 [196 Cal.Rptr. 161]; *People* v. *Schrieber* (1975) 45 Cal.App.3d 917, 924 [119 Cal.Rptr. 812]; *People* v. *Lachman* (1972) 23 Cal.App.3d 1094, 1098 [100 Cal.Rptr. 710]; *People* v. *Perkins* (1981) 126 Cal.App.3d Supp. 12, 21 [179 Cal.Rptr. 431]; *Greaves* v. *State, supra,* 528 P.2d 805, 807; *Coxe* v. *State* (Del. 1971) 281 A.2d 606, 607; Oversight into the Administration of State and Local Court Adjudication of Driving While Intoxicated: Hearings Before Subcom. on Courts of Sen. Com. on the Judiciary, 97th Cong., 1st Sess. (1981) Serial No. J-97-79, pp. 99-101 [hereinafter Hearings Before Subcom. on Courts] [statement of Dr. Roger P. Maickel, noting that typically vision impairment begins at 0.03-0.08 percent blood alcohol and becomes significant in all subjects at 0.10 percent; reaction-time impairment begins at 0.04 percent; judgment of distance, dimensions and speed at 0.08 percent; coordination and memory at 0.10 percent].) Section 23152, subdivision (b), represents a legislative determination to that effect. (Accord, *Greaves* v. *State, supra,* 528 P.2d 805, 807; *Coxe* v. *State, supra,* 281 A.2d·606, 607; *State* v. *Gerdes, supra,* 253 N.W.2d 335, 335-336; *State* v. *Clark* (Ore. 1979) 286 Ore. 33 [593 P.2d 123, 126]; *State* v. *Basinger, supra,* (N.C.App. 1976) 226 S.E.2d 216, 218; *People* v. *Fox* (N.Y.Just.Ct. 1976) 87 Misc.2d 210 [382 N.Y.S.2d 921, 925-926]; cf. *Erickson* v. *Municipality*

---

[11]Criminal Justice Profile (Cal. Dept. Justice 1982) 58. Indeed, this figure significantly underreports the pervasiveness of the problem. Studies have estimated drinking drivers' risk of apprehension to be between 1 in 2,000 (e.g., Borkenstein, *Problems of Enforcement, Adjudication and Sanctioning,* in Proceedings of the Sixth Internat. Conf. on Alcohol, Drugs & Traffic Safety (Israelstam & Lambert, edits. 1975) at pp. 655, 660) and 1 in 200. (Beitel et al., *Probability of Arrest While Driving Under the Influence of Alcohol* (1975) 36 J. Stud. Alcohol 109, 114.)

*of Anchorage* (Alaska App. 1983) 662 P.2d 963, 969-970, fn. 3.) Indeed, the available scientific information would support an even lower figure. (Hurst, *Estimating the Effectiveness of Blood Alcohol Limits* (1970) 1 Behav. Research Highway Safety 87; Ross, Deterring the Drinking Driver (1982) pp. 2-3; Jones & Joscelyn, Alcohol and Highway Safety 1978, *op. cit. supra,* pp. 35-50; Hearings Before Subcom. on Courts, *supra,* pp. 99-101; Gray, Attorneys' Textbook of Medicine (3d ed. 1983) ¶¶ 133.52-133.52(3).) At least two states and several foreign countries have established standards between 0.05 percent and 0.08 percent.[12] We have no difficulty concluding that the 0.10 percent figure fixed by section 23152, subdivision (b), is rationally related to exercise of the state's legitimate police power. (*Roberts* v. *State, supra,* 329 So.2d 296, 297.)

## B. Void for Vagueness

Five of our sister states have addressed claims of unconstitutional indefiniteness with respect to analogous 0.10 percent statutes, and all have found the contentions meritless. (*Fuenning* v. *Superior Court* (Ariz. 1983) 680 P.2d 121, 127-129; *Van Brunt* v. *State* (Alaska App. 1982) 646 P.2d 872, 873; *State* v. *Franco, supra,* (Wash. 1982) 639 P.2d 1320, 1324; *Roberts* v. *State, supra,* (Fla. 1976) 329 So.2d 296, 297; *Greaves* v. *State, supra,* (Utah 1974) 528 P.2d 805, 807-808; cf. *State* v. *Pickering* (Me. 1983) 462 A.2d 1151, 1160.)[13] Additionally, a Court of Appeal and two superior court appellate departments have determined the precise issue adversely to defendant's view. (*People* v. *Lewis, supra,* 148 Cal.App.3d 614, 617-619; *People* v. *Lujan, supra,* 141 Cal.App.3d Supp. 15, 20-26; *People* v. *Woo-*

---

[12](Utah Code Ann., § 41-6-44(1) (0.08 percent); Ore. Rev. Stats. §§ 487.540, 487.545 (0.08 percent). The foreign countries and their respective blood alcohol levels are: Australia (0.05) (Victoria); Austria (0.08); Canada (0.08); France (0.08); Germany (0.08); Great Britain (0.08); The Netherlands (0.05/0.08) (combination of tests); Norway (0.05); Sweden (0.05). The level in New Zealand is 0.10. Ross, Deterring the Drinking Driver (1982) pp. 20-70; Cameron, *The Impact of Drinking-Driving Countermeasures: A Review and Evaluation* (1979) Contemp. Drug Prob. 495, 512-519; see generally, Ross et al., *Deterrence of Drinking and Driving in France: An Evaluation of the Law of July 12, 1978* (1982) 16 Law & Soc'y Rev. 345; Ross, *Law, Science and Accidents: The British Road Safety Act of 1967* (1973) 2 J. Legal Stud. 1; Votey, *Scandinavian Drinking-Driving Control: Myth or Intuition?* (1982) 11 J. Legal Stud. 93; Votey, *Control of Drunken Driving Accidents in Norway: An Econometric Evaluation of Behavior Under Uncertainty* (1983) 11 J.Crim.Just. 153; Snortum, *Controlling the Alcohol-Impaired Driver in Scandinavia and the U.S.: Simple Deterrence and Beyond* (1984) 12 J.Crim.Just. 331.)

[13]Other states have also addressed and unanimously rejected challenges to similar statutes on the grounds, inter alia, of equal protection (e.g., *State* v. *Watts* (Mo. 1980) 601 S.W.2d 617, 621; *State* v. *Gerdes* (S.D. 1977) 252 N.W.2d 335, 336), unconstitutional presumption of intoxication (e.g., *State* v. *Abbott* (Ore.App. (1973) 15 Ore.App. 205 [514 P.2d 355, 357] [former 0.15 percent law]), and failure to require actual knowledge of the condition proscribed (*Van Brunt* v. *State* (Alaska App. 1982) 646 P.2d 872, 873).

*dard* (1983) 143 Cal.App.3d Supp. 1, 4 [192 Cal.Rptr. 229].)[14] Defendant asserts, however, that we should not be persuaded by these decisions, because they fail to sufficiently analyze the issues and justify the results. ■■ We proceed to review defendant's claim that section 23152, subdivision (b), is void for vagueness.

Both article I, section 7, of the California Constitution and the Fourteenth Amendment to the United States Constitution declare that no person shall be deprived of life, liberty or property without due process of law. It has been recognized for over 80 years that due process requires inter alia some level of definiteness in criminal statutes. (Note, *Due Process Requirements of Definiteness in Statutes* (1948) 62 Harv.L.Rev. 77, 77, fn. 2.) ■ Today it is established that due process requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt. ■ ■■ ■ (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 46 S.Ct. 126]; *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]; *People* v. *Mirmirani* (1981) 30 Cal.3d 375, 382 [178 Cal.Rptr. 792, 636 P.2d 1130], and cases cited; *People* v. *Superior Court* (*Engert*) (1982) 31 Cal.3d 797, 801 [183 Cal.Rptr. 800, 647 P.2d 76]; Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67-96; Note, *Due Process Requirements of Definiteness in Statutes* (1948) 62 Harv.L.Rev. 77 *passim.*)[15]

---

[14]In a related context an appellate department held that the 0.10 percent presumption of intoxication applicable to section 23152, subdivision (a), cases (former § 23126, subd. (a)(3), present § 23155, subd. (a)(3)) is not unconstitutionally indefinite. (*People* v. *Perkins* (1981) 126 Cal.App.3d Supp. 12, 21 [179 Cal.Rptr. 431] [summarily dismissing claim as "totally without merit"].)

[15]The United States Supreme Court recently observed that "[a]lthough the [void-for-vagueness] doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" (*Kolender* v. *Lawson* (1983) 461 U.S. 352, [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858], citing *Smith* v. *Goguen* (1974) 415 U.S. 566, 574 [39 L.Ed.2d 605, 613, 94 S.Ct. 1242]; see also LaFave & Scott, Criminal Law (1972) § 11, p. 87.) We observe, however, that due process has never been interpreted so strictly as to require the "actual" notice to which *Kolender* and *Smith* refer; at most, the cases require "fair notice." (E.g., *Smith, supra,* 415 U.S. at p. 572, fn. 8 [39 L.Ed.2d at p. 611] ["fair notice"]; *Colautti* v. *Franklin* (1979) 439 U.S. 379, 390 [58 L.Ed.2d 596, 606, 99 S.Ct. 675] ["fair notice," citing *United States* v. *Harriss* (1954) 347 U.S. 612, 617 (98 L.Ed. 989, 996, 74 S.Ct. 808)]; *Rose* v. *Locke* (1975) 423 U.S. 48, 49 [46 L.Ed.2d 185, 188, 96 S.Ct. 243] ["fair warning"]; see also, *McBoyle* v. *United States* (1931) 283 U.S. 25, 27 [75 L.Ed. 816, 818, 51 S.Ct. 340], in which Justice Holmes observed, "[a]lthough it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.") In the context of this case we find it unnecessary to address the question whether the notice requirement is, or should be, subordinate to the interest in establishing guidelines for law enforcement.

■ To begin with the second component, the statute could not be more precise as a standard for law enforcement. (Freund, *The Use of Indefinite Terms in Statutes* (1921) 30 Yale L.J. 437, 437.) It gives no discretion whatever to the police, and thus is not susceptible of arbitrary enforcement. (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 252 [158 Cal.Rptr. 330, 599 P.2d 636].) Indeed, the very precision of the standard assures the statute's validity in this respect. (Cf. Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67, 90-91.)

Turning now to the "fair notice" component of the void-for-vagueness doctrine, we observe that the real thrust of defendant's argument is that the statute is in effect "void for preciseness." His complaint is not that the language of the statute is vague or ambiguous, but that it is too exact. His novel theory is that the statute fails to notify potential violators of the condition it proscribes, because it is impossible for a person to determine by means of his senses whether his blood-alcohol level is a "legal" 0.09 percent or an "illegal" 0.10 percent. The latter observation is probably true as a matter of fact, but it does not affect the constitutionality of the statute.

Defendant's theory would render the void-for-vagueness doctrine internally inconsistent: the notice requirement would compete with the need to provide precise standards for law enforcement. When, as in the present case, a statutory standard requires scientific measurement, the very factor that assures due process under the "standards" component would violate due process under the "notice" component.[16]

It is apparently defendant's contention that due process requires notice that is subjectively verifiable, according to the terms of the statute, at the instant before the alleged violation. He claims the statute is invalid because it is impossible for ordinary persons actually to know when their blood alcohol reaches the proscribed point. No court, however, has interpreted the notice requirement so strictly;[17] indeed, such a view would invalidate many other criminal laws, violations of which depend on an after-the-fact determination by a judge or jury as to the defendant's state of mind or the reasonableness of his behavior. (E.g., *Nash* v. *United States* (1913) 229 U.S. 373, 377 [57 L.Ed. 1232, 1235, 33 S.Ct. 780]; Note, *Due Process Requirements of Definiteness in Statutes* (1948) 62 Harv.L.Rev. 77, 79.)

■ "Fair notice" requires only that a violation be described with a " 'reasonable degree of certainty' " (*People* v. *Mirmirani, supra,* 30 Cal.3d

[16]Additionally, if we were to choose to follow the United States Supreme Court's suggestion that the notice consideration is subordinate to the interest in providing precise standards for law enforcement, defendant's theory would require that the lesser rationale prevail over the greater.

[17]Due Process requires only "fair notice," not "actual notice." (See fn. 15, *ante.*)

375, 382) so that "ordinary people can understand what conduct is prohibited." (*Kolender* v. *Lawson, supra,* 461 U.S. 352, — [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858].) The notice provided must be such that prosecution does not "trap the innocent" without "fair warning." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294].)

■ One who drives a vehicle after having ingested sufficient alcohol to approach or exceed the level proscribed is neither "innocent" within the meaning of *Grayned,* nor is he without "fair warning." His behavior is not "innocent" because one who drives with a blood-alcohol content above 0.05 percent is in jeopardy of violating section 23152, subdivision (a), i.e., driving while under the influence. (§ 23155, subd. (a)(2).) Indeed, in a number of states such a driver would be prima facie impaired well before he reached 0.10 percent.[18] It is difficult to sympathize with an "unsuspecting" defendant who did not know if he could take a last sip without crossing the line, but who decided to do so anyway.

The very fact that he has consumed a quantity of alcohol should notify a person of ordinary intelligence that he is in jeopardy of violating the statute. (Accord, *Fuenning* v. *Superior Court, supra,* 680 P.2d 121, 129 ["it requires more than a small amount of alcohol to produce a .10% BAC [blood-alcohol content]. Those who drink a substantial amount of alcohol within a relatively short period of time are given clear warning that to avoid possible criminal behavior they must refrain from driving." (Fn. omitted.)] cf. *People* v. *Perkins, supra,* 126 Cal.App.3d Supp. 12, 21.) Although this factor alone sustains our determination that the statute provides adequate warning to potential violators, we find some further support in this regard from the existence for over 15 years of an analogous "0.10 percent" rebuttable presumption of being under the influence of alcohol pursuant to section 23155 and its predecessor, section 23126.[19] Considering also today's heightened level of public awareness regarding the problem, we cannot believe that any person who drives after drinking would be unaware of the possibility that his blood-alcohol level might equal or exceed the statutory standard.

---

[18](E.g., N.Y.Stats., Veh. & Traffic, § 1195(c) (blood alcohol between 0.07 and 0.10 is "prima facie impairment"); Mich.Stat.Ann., § 9.2325(1)(3)(b) [presumption of impairment if blood alcohol is between 0.07 and 0.10 percent].)

[19]As observed by one commentator, "[l]ong and successful administration of a statute establishes patterns of social conduct to which interested parties may have become adjusted. The pattern of conduct may, of course, result eventually in the development of a commonly understood meaning of the statutory term." (Note, *Due Process Requirements of Definiteness in Statutes* (1948) 62 Harv.L.Rev. 77, 83.) Although, as noted above, the two subdivisions of section 23152 are substantively different, for purposes of vagueness analysis the 0.10 percent figures employed directly in subdivision (b) and indirectly in subdivision (a) are analogous.

(*Greaves* v. *State, supra,* 528 P.2d 805, 808; LaFave & Scott, Criminal Law (1972) § 11, p. 86, text and cases cited in fns. 28-29; Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67, 87, fn. 99.) If, in the exceptional case, a person experiencing the symptoms of alcohol ingestion[20] failed to be aware of them, the most probable reason would be depression of the brain function caused by the alcohol itself. "Fair notice," however, has not been interpreted as requiring the overcoming of such a self-induced obstacle. (Cf. *Williford* v. *State* (Alaska App. 1982) 653 P.2d 339, 342; *Morgan* v. *Municipality of Anchorage* (Alaska App. 1982) 643 P.2d 691, 692.)

 Furthermore, a statute " ' "will be upheld if its terms may be made reasonably certain by reference to other definable sources." ' " (*County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 673 [114 Cal.Rptr. 345, 522 P.2d 1345], and cases cited.) Charts are readily available to the public that show with reasonable certainty the number of different alcoholic beverages necessary for a particular individual to reach a blood-alcohol level of 0.10 percent. For example, the 1982 California Driver's Handbook, issued by the Department of Motor Vehicles and available in English and five foreign languages free of charge to any driver, contained a blood alcohol estimation chart on the inside of its front cover, together with the admonition: "Keep this booklet in the glove compartment of your vehicle. It will help you many times." (Cal. Driver's Handbook (Cal. Dept. Motor Veh. 1982) p. 2.) The current handbook contains a significant discussion of the 0.10 percent law, and concludes with the highlighted admonition that "[t]he average size person (160 pounds) can reach a .10 BAC [blood-alcohol content] with as few as three or four average drinks (or beers) in one hour." (Cal. Driver's Handbook (Cal. Dept. Motor Veh. 1983) p. 40.) Although it is true that even with use of a chart a person may err in his estimate and thereby violate the statute, this fact does not render the statute invalid. "[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." (*Nash* v. *United States, supra,* 229 U.S. 373, 377 [57 L.Ed. 1232, 1235].) We are aware of none that has been declared unconstitutional for that reason.

We decline to frustrate the Legislature's clear and legitimate purpose in enacting the statute involved here. (*People* v. *Vis* (1966) 243 Cal.App.2d 549, 555 [52 Cal.Rptr. 527], and cases cited; cf. *Winters* v. *New York* (1948) 333 U.S. 507, 535 [92 L.Ed. 840, 860, 68 S.Ct. 665] [dis. opin. of Frankfurter, J.].) We conclude that under both the federal and state Constitutions, section 23152, subdivision (b), provides adequate notice of the

---

[20]See Moenssens & Inbau, Scientific Evidence in Criminal Cases (2d ed. 1978) pages 73-74.

conduct proscribed, and is not void for vagueness. (*Grayned* v. *City of Rockford, supra,* 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294]; *People* v. *Mirmirani, supra,* 30 Cal.3d 375, 382.)[21]

## IV. PRIOR CONVICTIONS

Defendant has also been charged with a prior conviction under former section 23102, subdivision (a) (driving while under the influence of alcohol), apparently for the purpose of enhancing penalty under sections 23165 and 23170. He denied this allegation, rather than demurring to it; but because the issue is of great importance and statewide concern, we nevertheless observe in closing that the propriety of such a charge was addressed and correctly resolved in favor of treating the prior violations as enhancements in *People* v. *Lujan, supra,* 141 Cal.App.3d Supp. 15, 29-31.

The judgment is affirmed.

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Weinstein, J.,* concurred.

Appellant's petition for a rehearing was denied January 19, 1984.

---

[21]We also reject the contentions of amici curiae that section 23152, subdivision (b), constitutes an impermissible discrimination against "those adult drivers who consume alcohol," or that it has an impermissible "chilling effect" on the right to travel. Equally untenable are assertions that the statute "invests the police with unlimited discretion to randomly stop and detain drivers," or that it somehow denies equal protection of the laws, or that it is invalid because mixed drinks from different bartenders may contain different amounts of alcohol.

*Assigned by the Chairperson of the Judicial Council.