215 Cal.App.3d 1569 (1989)
264 Cal. Rptr. 298
THE PEOPLE, Plaintiff and Respondent,
v.
WILLIAM TROY WEATHERILL, Defendant and Appellant.
Docket No. B042229.
Court of Appeals of California, Second District, Division Seven.
November 28, 1989.
*1570 COUNSEL
Dennis A. Fischer and Alan S. Yockelson for Defendant and Appellant.
*1571 James K. Hahn, City Attorney, William N. Sterling and Peter W. Mason, Deputy City Attorneys, for Plaintiff and Respondent.
OPINION
WOODS (Fred), J.
(1a) Do Vehicle Code sections[1] 23202 and 23206, which prohibit diversion "in any" driving under the influence case, make an exception for a developmentally disabled defendant? Our answer is no.

PROCEDURAL AND FACTUAL BACKGROUND
On October 22, 1986, defendant was charged with misdemeanor violations of section 23152, subdivision (a), driving under the influence of alcohol, and section 23152, subdivision (b), driving with .10 percent alcohol in his blood. As to both counts it was alleged that he had suffered a 1984 conviction of section 23152, subdivision (a).
At his arraignment, defendant's counsel moved for diversion pursuant to Penal Code section 1001.21 which provides: "(a) This chapter shall apply whenever a case is before any court upon an accusatory pleading at any stage of the criminal proceedings, for any person who has been evaluated by a regional center for the developmentally disabled and who is determined to be developmentally disabled by such regional center, and who therefore is eligible for its services. [¶] (b) This chapter applies to any offense which is charged as or reduced to a misdemeanor, except that diversion shall not be ordered when the defendant previously has been diverted under this chapter within two years prior to the present criminal proceedings."
A Mr. John R. Lewis, present at the arraignment, indicated to the court that he was a social worker from the Lanterman Regional Center[2] and that defendant had been diagnosed developmentally disabled. Mr. Lewis further informed the court that the regional center was not residential nor even outpatient but merely "managed" cases of developmentally disabled persons.
After several continuances, defendant's diversion motion was heard on March 9, 1987. The court denied the motion, ruling that Penal Code section 1001.21 is inapplicable when a defendant is charged with driving under the influence of alcohol.
*1572 Defendant sought to overturn this ruling by his petition to the superior court for a writ of mandate. Superior Court Judge Jack M. Newman denied the petition. Defendant then filed a petition for a writ of mandate with the Court of Appeal. Division Four of this court denied the writ.
On November 13, 1987, defendant waived jury. By agreement, his court trial consisted of the submission into evidence of his arrest report and a stipulation concerning his blood-alcohol reading, .24 percent. The court found the defendant guilty as charged and found the alleged prior driving-under-the-influence-of-alcohol conviction true. As part of a plea-sentence agreement the court placed defendant on three years' summary, not formal, probation subject to various conditions including attending twenty-four Alcoholics Anonymous meetings through the Lanterman Regional Center and the payment of any civil judgment arising from this case.[3] Count 2, section 23152, subdivision (b), was dismissed.
On April 25, 1989, the appellate department of the superior court filed and certified for publication their unanimous opinion affirming the judgment of conviction.
On May 31, 1989, pursuant to rule 62(a), California Rules of Court, we ordered the matter transferred to this court to secure uniformity of decision and to settle important questions of law.

DISCUSSION

Plain meaning of section 23202
Central to our discussion is section 23202 and its prohibition against diversion. By forbidding any stay in proceedings, the essential mechanism for any diversion program, it precludes diversion in any driving under the influence case. The section provides: "(a) In any case in which a person is charged with a violation of Section 23152 or 23153, prior to acquittal or conviction, the court shall not suspend or stay the proceedings for the purpose of allowing the accused person to attend or participate, nor shall the court consider dismissal of or entertain a motion to dismiss the proceedings because the accused person attends or participates during that suspension, in any one or more education, training, or treatment programs, including, but not limited to, a driver improvement program, a treatment program for persons who are habitual users of alcohol or other alcoholism program, a program designed to offer alcohol services to problem drinkers, an alcohol or drug education program, or a treatment program for persons who are *1573 habitual users of drugs or other drug-related program. [¶] (b) This section shall not apply to any attendance or participation in any education, training, or treatment programs after conviction and sentencing, including attendance or participation in any of those programs as a condition of probation granted after conviction when permitted pursuant to this article."
Although section 23202 applies only "prior to acquittal or conviction," section 23206, subdivision (a)[4] imposes a similar postconviction constraint.
(2) In ascertaining the meaning of section 23202 we begin with the cardinal rule of all statutory construction: "The fundamental rule is that a court should ascertain the intent of the Legislature so as to effectuate the law's purpose and in determining intent the court first turns to the words used." (People v. Overstreet (1986) 42 Cal.3d 891, 895 [231 Cal. Rptr. 213, 726 P.2d 1288]. Accord People v. Woodhead (1987) 43 Cal.3d 1002, 1007 [239 Cal. Rptr. 656, 741 P.2d 154]; People v. Aston (1985) 39 Cal.3d 481, 489 [216 Cal. Rptr. 771, 703 P.2d 111].)
(1b) The words of section 23202, "in any [section 23152 or 23153] case" are all-inclusive, as are the words "if any person," in the correlative section 23206, subdivision (a). (See fn. 4.) Their apparent meaning is that all driving-under-the-influence defendants, without exception, shall have their guilt or innocence determined without delay and without diversion and those found guilty shall be timely sentenced. This meaning is reinforced by the mandate of section 23206, subdivision (c): "The court shall not absolve a person who is convicted of a violation of Section 23152 or 23153 from the obligation of spending the minimum time in confinement, if any, or of paying the minimum fine provided in this article."
Perceiving no ambiguity in sections 23202 and 23206 our inquiry would normally end. But defendant contends that this seeming all-inclusive prohibition against diversion is apparent only. Actually when read with Penal Code section 1001.21, ante, it is clear, defendant argues, that the Legislature intended to allow diversion for the developmentally disabled.
We therefore continue our inquiry and "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (People v. Woodhead, supra, 43 Cal.3d 1002, 1008.)

*1574 Legislative History: Assembly Bill No. 541

The prologue to Assembly Bill No. 541 (hereafter AB 541) (1981-1982 Reg. Sess.), the statute which reformed California's driving-under-the-influence laws and added sections 23202 and 23206 to the Vehicle Code, is a long and painful one. As Justice Mosk observed, quoting a turn of the century editorialist, "`[i]nebriates and moderate drinkers are the most incapable of all persons to drive motor wagons. The general palsy and diminished power of control of both the reason and the senses are certain to invite disaster in every attempt to guide such wagons.'" (Burg v. Municipal Court (1983) 35 Cal.3d 257, 261 [198 Cal. Rptr. 145, 673 P.2d 732].)
Disaster was invited and disaster came. The statistics have become familiar: "Nearly one-quarter of all traffic accidents resulting in injury involved the use of alcohol. [Citations.] Traffic deaths in the United States exceed 50,000 annually, and approximately one-half of those fatalities are alcohol-related." (35 Cal.3d at p. 261.) California led the parade. "Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were killed than in the bloodiest year of the Vietnam War." (Id. at p. 262.)
Even these statistics inadequately described the "wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California" (35 Cal.3d at p. 262) caused by drunk drivers. Legislative efforts to curb the carnage proved unavailing.
In 1979 the Legislature made this finding: "The Legislature finds and declares that problems related to the inappropriate use of alcoholic beverages adversely affect the general welfare of the people of California. These problems, which constitute the most serious drug problem in California, include, but are not limited, to the following: [¶] (a) Substantial fatalities, permanent disability, and property damage which result from driving under the influence of alcoholic beverages and a drain on law enforcement, the courts, and penal system which result from crimes involving inappropriate alcohol use." (Health & Saf. Code, § 11760.)
It was these "substantial fatalities," cold words to mark the loved sons and daughters of grieving parents, which created Mothers Against Drunk Driving (MADD), the source and principal sponsor of AB 541. As the Legislative Intent Service (LIS) indicates, Candy Lightner, founder and president of MADD, was a constituent of Assemblywoman Jean Moorhead, the author of AB 541.
*1575 Support for AB 541 was strong. A public opinion survey conducted by Field Research Corporation in California revealed that 88 percent of respondents favored tougher laws for drunk drivers. (LIS, Veh. Code, § 23202.) Media endorsements were both passionate and unrelenting. E.g., a KPIX television editorial in San Francisco told the story of Gail Tietjen, an 18-year-old whose drunk boyfriend crashed into a tree causing her severe brain damage. Seven years after she learned how to walk, talk and feed herself again, after she had graduated college, and after she had started a good job, another drunk driver killed her. Her mother said, "[t]hey've killed my daughter twice." (LIS, SDC p. 1.)
One such KPIX editorial elicited about 500 letters which the station forwarded to the speaker of the state assembly. (LIS, SDC p. 1.)
The public wanted and AB 541 provided "[c]elerity and certainty of punishment." (Burg v. Municipal Court, supra, 35 Cal.3d 257, 263.) As the Assembly Committee On Criminal Justice analysis indicated, AB 541 would raise minimum fines, "would require that upon conviction ... sentence would have to be imposed," that entering a treatment program "permits the suspension of some, but not all, of the mandatory penalties," etc. The Ways & Means Staff Analysis found that "[t]he most significant change is the requirement for mandatory minimum jail terms for violations of various drunk driving codes, regardless of whether probation is granted." (Original italics.) The Senate Committee On Judiciary noted that the bill "would require the court to impose specified minimum punishments in all cases without exception" and that "this bill would prohibit a stay of proceedings before acquittal or conviction...."
AB 541 did not overlook a major loophole to certainty of punishment, viz., pretrial diversion. Although it is unclear when California courts first began employing pretrial diversion, the first California statute authorizing such diversion was enacted in 1972. (Pen. Code, § 1000 et seq. See Davis v. Municipal Court (1988) 46 Cal.3d 64, 73 [249 Cal. Rptr. 300, 757 P.2d 11].) This statute authorized diversion in drug cases but soon induced "numerous local police departments and district attorneys throughout California, acting with the encouragement of grants provided by the federal government," to implement experimental diversion programs in other cases as well. (Id. at p. 74.) When an Attorney General's opinion questioned the validity of these experimental programs (ibid.) "the Legislature in 1977 adopted as an urgency measure the predecessor of the current chapter 2.7 (Stats. 1977, ch. 574, § 3, p. 1821)." (Ibid.) (See Pen. Code, § 1001.) This measure expressly declared that the 1972 drug diversion statute did not preempt the pretrial diversion field.
*1576 With the preemption shadow thus removed, pretrial diversion programs proliferated. One such program, specifically for driving-under-the-influence defendants, was called the "Lucky Deuce."[5] As described by the Senate Committee On Judiciary analysis of AB 541, "Under the auspices of the court, the district attorney, and defense counsel, a first-time offender can elect to enter a year-long `Lucky Deuce' program at his own expense. If he successfully completes the program, the offender can have his DUI offense reduced to a reckless, a one or two point moving violation, or even dismissed entirely when he does an outstanding job. The proceedings are stayed pending the offender's completion of the program and the final disposition is made by the court, in its sole discretion." (LIS p. 8.)
Although the precise number of such driving-under-the-influence diversion programs  commercial and charitable, formal and informal, prosecutor initiated and court initiated, statutory and nonstatutory  is not stated in the Legislative Intent Service, the order of their magnitude is suggested by Davis v. Municipal Court, supra, 46 Cal.3d 64. In considering a challenge to a diversion program, created by the San Francisco District Attorney pursuant to Penal Code section 1001 et seq., the court stated that if successful this challenge might invalidate that program "as well as 811 misdemeanor diversion programs throughout the state." (Italics added.) (Davis v. Municipal Court, supra, 46 Cal.3d 64, 73.)
It was to bar such diverse and voluminous diversion programs that section 23202 was included in AB 541. Its inclusion was not overlooked. The Legislative Counsel's Digest stated: "The bill would prohibit a stay of proceedings before acquittal or conviction or a dismissal of the proceedings because the accused participates in a driver improvement program or treatment program for habitual users of alcohol or drugs." All legislative committees which considered and analyzed AB 541 similarly noted the prohibition provision of its section 23202. The Senate Committee On Judiciary report stated, "When the accused was charged with driving under the influence, this bill would prohibit a stay of proceedings...."
Opponents of AB 541 clearly perceived that existing law permitted unrestricted pretrial diversion (LIS, letter, p. 3) and that section 23202 prohibited all driving under the influence diversion. One such opponent, the American Civil Liberties Union, in its April 3, 1981, letter to the Assembly Committee on Criminal Justice, wrote "[a] sentencing structure which deprives judges of the right to exercise their discretion, and particularly one which deprives them of the right to use diversion programs, may, in fact, *1577 remove from society one of the more effective tools available for combatting this problem. The judge in the courtroom  not 120 legislators in Sacramento  is the best barometer of the circumstances surrounding any individual case. They should not be stripped of their judicial discretion in these matters." (Italics added.)
Neutral observers, such as the Health and Welfare Agency, shared the common understanding of section 23202. Its analysis noted that "[c]ourts [would be] prohibited from staying or suspending proceedings prior to conviction or sentencing, to allow accused persons to participate in driver improvement, alcohol or other treatment programs." (LIS, PE p. 29.) The Department of Alcohol and Drug Programs analysis stated, "[t]he bill would prohibit any stay of proceedings with regard to these offenses...." (LIS, PE p. 60.) (Italics added.)
Thus legislative intent, as revealed by the history of AB 541, accords with the plain meaning of section 23202: all driving under the influence defendants, without exception, shall have their guilt or innocence determined without delay or diversion.[6]

Conflict with Penal Code section 1001.21
Notwithstanding the plain meaning and legislative history of section 23202, defendant asserts that because he is developmentally disabled he is not barred from pretrial diversion. His argument parses the treatment programs description of section 23202, finds it more constrictive than programs afforded by Penal Code section 1001.20, and therefore concludes the two sections only "appear ... to conflict" but are "not at all irreconcilable." We disagree.
It is clear that the phrase "education, training, or treatment programs" (§ 23202) is intended to be and is all-inclusive. It comprehends all Penal Code section 1001.20 programs. The two sections irreconcilably conflict.[7]

Specific statute controls over general statute
(3) When a general statute conflicts with a specific statute the specific statute controls the general one. (People v. Gilbert (1969) 1 Cal.3d 475, 479 *1578 [82 Cal. Rptr. 724, 462 P.2d 580]; In re Williamson (1954) 43 Cal.2d 651, 654 [276 P.2d 593].) The referent of "general" and "specific" is subject matter. (1c) Thus, in the instant case, the subject matter of Penal Code section 1001.21 is misdemeanor diversion. That section, applying as it does to all misdemeanors, even felonies reduced to misdemeanors, comprehends hundreds of misdemeanors in scores of codes and is therefore a general statute.
By contrast, the subject matter of section 23202 is driving-under-the-influence diversion. It applies to a single type of conduct and comprehends only two offenses, sections 23152 and 23153. Section 23202 is a specific statute and controls, to the extent of their inconsistency, the general statute, Penal Code section 1001.21.[8]

More recent statute supersedes older statute
Penal Code section 1001.21, the subject diversion statute for the developmentally disabled, was enacted in 1980 (Stats. 1980, ch. 1253, § 1, p. 4232) a year earlier than section 23202 (Stats. 1981, ch. 940, § 32, p. 3571). (4), (1d) Since the two statutes conflict, the later statute, section 23202, "by implication will be deemed to have repealed any contrary provisions contained in the earlier." (Santa Barbara Federation of Teachers v. Santa Barbara High Sch. Dist. (1977) 76 Cal. App.3d 223, 236 [142 Cal. Rptr. 749]; accord Fuentes v. Workers' Comp. Appeals Bd. (1976) 16 Cal.3d 1, 7 [128 Cal. Rptr. 673, 547 P.2d 449]; City of Petaluma v. Pac. Tel. & Tel. Co. (1955) 44 Cal.2d 284, 288 [282 P.2d 43]; Woodard v. Southern Cal. Permanente Medical Group (1985) 171 Cal. App.3d 656, 664 [217 Cal. Rptr. 514] ["`.... if there is an irreconcilable conflict between the new provision and the prior statutes, the new provision will control as it is the later expression of the legislature.'"]; Fleming v. Kent (1982) 129 Cal. App.3d 887, 891 [181 Cal. Rptr. 361] ["... a more recent statute will govern and take precedence over an earlier provision."]; Carlton Santee Corp. v. Padre Dam Mun. Water Dist. (1981) 120 Cal. App.3d 14, 29 [174 Cal. Rptr. 413]; Heller Properties Inc. v. Rothschild (1970) 11 Cal. App.3d 705, 710 [90 Cal. Rptr. 133] ["... provisions of the statute later in time must control...."].)[9]

The doctrine of expressio unius est exclusio alterius
(5) Both defendant and the dissent rely upon the doctrine of expressio unius est exclusio alterius, i.e., "`the expression of certain things in a statute *1579 necessarily involves exclusion of other things not expressed....'" (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1391, fn. 13 [241 Cal. Rptr. 67, 743 P.2d 1323].) The doctrine is illustrated by Dyna-Med. The issue was "whether the FEHA [California Fair Employment and Housing Act] grants the commission authority to award punitive damages." (Id. at p. 1385.) Its resolution turned on the interpretation of the following empowering phrase: "and to take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization...." (Ibid.)
Noting that the doctrine was a "mere guide[] and will not be applied so as to defeat the underlying legislative intent otherwise determined" (43 Cal.3d at p. 1391), the court found that the express enumeration of four actions (hiring, reinstatement, upgrading, and restoration to membership), all of one type, impliedly excluded an unexpressed action (punitive damages) of a different type.
The doctrine was applicable, of course, because the statute expressly enumerated "certain things."
Similarly, a detainer statute which only referred to "untried indictments, informations, or complaints" impliedly excluded sentencing. (People v. Castoe (1978) 86 Cal. App.3d 484, 489 [150 Cal. Rptr. 237].)
The doctrine is inapplicable to the instant case because there is no "expression of certain things." Unlike Dyna-Med and People v. Castoe, the statute here leaves no room for exclusion because it includes everything. In section 23202 the all-inclusive phrase "in any case" is used; in section 23206, subdivision (a) the all-inclusive phrase "[i]f any person" is used; and in section 23206, subdivision (c) the all-inclusive phrase "a person" is used.

Consistency of section 23202 with later-enacted diversion statutes
(1e) Defendant perceives an inconsistency between section 23202's all-inclusive diversion bar and the selective bar in subsequently enacted diversion statutes. There is no inconsistency.
As we have indicated, in 1981 when the Legislature enacted section 23202 it prohibited all driving-under-the-influence diversion programs, statutory ones like Penal Code section 1001.21, and nonstatutory ones. Later, when the Legislature enacted or reenacted diversion programs, e.g., Penal Code section 1001 et seq. (Stats. 1982, ch. 42) and Penal Code section 1001.50 et seq. (Stats. 1982, ch. 1251), in order to avoid the risk of implied *1580 repeal, it specifically exempted all driving-under-the-influence charges. In doing so it expressed its intent consistently: section 23202 bars all diversion programs.

Sentencing and rehabilitation
Our conclusion that a developmentally disabled defendant charged with driving under the influence is ineligible for diversion (§ 23202) does not mean that he or she will receive less rehabilitative assistance. Trial judges have broad sentencing discretion (People v. Lent (1975) 15 Cal.3d 481, 486 [124 Cal. Rptr. 905, 541 P.2d 545]) and may prescribe, as conditions of probation, appropriate education, training, and treatment programs. (Pen. Code, § 1203.1.)[10] Counties have a duty, in connection with alcohol education programs, to provide services for those groups with particular needs. (§ 23161, subd. (d).)
Moreover, the obligation of the State of California to provide all necessary and appropriate services to a developmentally disabled person (Welf. & Inst. Code, §§ 4501 et seq.) is not altered or reduced by that person being charged with a driving under the influence offense. If such a person was entitled to special habilitation services before being charged, he or she is no less entitled after being charged.

DISPOSITION
The judgment is affirmed.
Lillie, P.J., concurred.
JOHNSON, J.
I respectfully dissent. This is an extraordinarily close case, however. In no sense is this one of those instances where the dissenter thinks the majority is guilty of an egregious error in its analysis or its interpretation of the facts. Nor is it one where some fundamental constitutional or legal principle is at stake. Indeed I consider the majority has presented a well-reasoned argument in support of its resolution of the conflict between these two statutes. The problem is the conflict is so profound, the Gordian knot so tightly wound, that an equally persuasive argument  indeed in my view a marginally more persuasive argument  can be made for the opposite resolution.
So I dissent more out of frustration than conviction. Perhaps by doing so this exchange of judicial opinions can serve as a signal to the Legislature *1581 this series of statutes has left the courts in a quandary. Traditional rules of statutory construction do not seem to really solve the puzzle; they cancel each other out. And, as can best be determined from the available evidence of legislative intent, the lawmakers did not expressly contemplate the issue bothering us here. So we are left to decipher the legislators' probable or possible intent on this question from what they said about those issues they did choose to discuss. I, for one, would ask the Legislature to enact its own ultimate resolution of this conflict, and have no strong preference for how they resolve it.
The majority has stated its well-argued case for the proposition that Vehicle Code section 23202 applies to mentally retarded defendants as well as others and excludes them from eligibility for diversion under Penal Code section 1001.20 et seq. I now explain the opposite view and why I find it marginally more persuasive. I would hold, primarily for reasons of legislative intent and public policy, that Vehicle Code section 23202 does not apply to mentally retarded defendants otherwise eligible for diversion under Penal Code section 1001.20 et seq.
The Penal Code authorizes the trial court to consider diverting to a treatment program a mentally retarded defendant charged with "any offense which is ... a misdemeanor, except that diversion shall not be ordered when the defendant previously has been diverted under this chapter within two years prior to the present criminal proceedings." (Pen. Code, § 1001.21.) If the defendant performs satisfactorily in the treatment program, "the criminal charges shall be dismissed at the end of the diversion period." (Pen. Code, § 1001.31.)
The Vehicle Code, on the other hand, provides that "[i]n any case in which a person is charged" with driving under the influence of alcohol "the court shall not suspend or stay ... [or] dismiss the proceedings because the accused person attends or participates" in any education, training or treatment program "including but not limited to a driver improvement program, a treatment program for persons who are habitual users of alcohol or other alcoholism program, a program designed to offer alcohol services to problem drinkers, an alcohol or drug education program, or a treatment program for persons who are habitual users of drugs or other drug-related program. [¶] (b) This section shall not apply to any attendance or participation in any education, training, or treatment programs after conviction and sentencing, including attendance or participation in any of those programs as a condition of probation granted after conviction when permitted pursuant to this article."
When, as here, the defendant is both mentally retarded and charged with driving under the influence of alcohol, the two sections are in conflict. One of them has to give way.
*1582 The People argue the Vehicle Code section should be interpreted literally to prohibit diversion "in any case" including a case in which the defendant is mentally retarded. In support of this contention the People cite the well-settled rule "a general provision is controlled by one that is special, the latter being treated as an exception to the former." (People v. Perez (1961) 198 Cal. App.2d 460, 464 [18 Cal. Rptr. 164].) The People argue the common subject of both sections is diversion. The Penal Code contains a general diversion provision authorizing eligibility for diversion for all misdemeanors alleged to have been committed by mentally retarded persons. The Vehicle Code, however, focuses on the misdemeanor of drunk driving and specifically prohibits diversion of anyone charged with this particular crime. Thus, the specific provision of the Vehicle Code governs over the general provision of the Penal Code. The People also point out a specific statute governs a more general statute regardless of which statute is enacted first (Warne v. Harkness (1963) 60 Cal.2d 579, 588 [35 Cal. Rptr. 601, 387 P.2d 377]), although here the Vehicle Code section prohibiting diversion was enacted a year after the Penal Code section permitting diversion for mentally retarded defendants.
Finally, the People argue that interpreting the Vehicle Code to prohibit diversion of mentally retarded defendants is consistent with the Legislature's "get tough" policy on drunk driving as evidenced by increased penalties for this offense. (See People v. Municipal Court (Hinton) (1983) 149 Cal. App.3d 951 [197 Cal. Rptr. 204]; Burg v. Municipal Court (1983) 35 Cal.3d 257, 263-265 [198 Cal. Rptr. 145, 673 P.2d 732].) To the extent the mentally retarded need specialized treatment in this area, the People point out this treatment can be provided after conviction and sentencing as a condition of probation. (Veh. Code, § 23202, subd. (b).) Indeed, Vehicle Code section 23161, subdivision (d) provides that if a county adopts an alcohol or drug education program to be included as a condition of probation, "the county shall provide, as appropriate, services to ... any ... group that has particular needs related to the program." The People note mentally retarded drunk drivers would qualify as a group with "particular needs" under Vehicle Code section 23161, subdivision (d).
The People's contentions have merit, but they do not clinch the argument. It can be contended just as forcefully that Vehicle Code section 23202 contains a general provision prohibiting diversion for any defendant in drunk driving cases while Penal Code section 1001.20 et seq. focus specifically on mentally retarded defendants and authorize diversion for this specific class of defendants no matter what misdemeanor they are charged with. In support of this argument, Mr. Weatherill points out the diversion program for the mentally retarded is the only diversion program which focuses on the status of the offender. All other diversion programs in title 6, *1583 part 2 of the Penal Code focus on the offense charged. (Cf. ch. 2.5 [narcotics and drug abuse cases]; ch. 2.6 [domestic violence]; ch. 2.65 [child abuse and neglect]; chs. 2.7 and 2.9 [misdemeanors]; ch. 2.9A [bad checks]. As to the sequence of enactment, the implied amendment of an existing code section by a subsequently enacted code section is not to be favored. (Penziner v. West American Finance Co. (1937) 10 Cal.2d 160, 176 [74 P.2d 252]; People v. Eaker (1980) 100 Cal. App.3d 1007, 1016 [161 Cal. Rptr. 417].) Implied amendment should be considered only if there is no reasonable basis for harmonizing the two sections. (Fuentes v. Workers' Comp. Appeals Bd. (1976) 16 Cal.3d 1, 7 [128 Cal. Rptr. 673, 547 P.2d 449]; Myers v. King (1969) 272 Cal. App.2d 571, 579 [77 Cal. Rptr. 625].) Although Penal Code section 1001.20 et seq. and Vehicle Code section 23202 cannot be simultaneously applied to Mr. Weatherill, this does not mean the sections are in irreconcilable conflict. For example, if Vehicle Code section 23202 specifically prohibited diversion for mentally retarded defendants accused of drunk driving, it would, as the later-enacted statute, impliedly abrogate any contrary language in Penal Code section 1001.20 et seq. (Cf. Santa Barbara Federation of Teachers v. Santa Barbara High School Dist. (1977) 76 Cal. App.3d 223, 234-236 [142 Cal. Rptr. 749].) However, in our case the statutes can be reconciled by applying Penal Code section 1001.20 et seq. to mentally retarded defendants accused of drunk driving and Vehicle Code section 23202 to all other defendants accused of drunk driving. Thus the later-in-time rule of statutory construction is not applicable. (Cf. Fuentes v. Workers' Comp. Appeals Bd., supra, 16 Cal.3d at p. 7.)
Mr. Weatherill also points out that in enacting other diversion programs, applicable to the general public, the Legislature specifically prohibited diversion for defendants charged with drunk driving. (Pen. Code, §§ 1001.2, subd. (a), 1001.51, subd. (b).) The diversion program for the mentally retarded contains no such prohibition. He concludes from this the Legislature did not intend to prohibit diversion of mentally retarded defendants because it did not express such a prohibition in the diversion program for the mentally retarded as it did with respect to diversion programs for the public generally. He cites in support of this argument the long-standing rule of statutory construction: expressio unius est exclusio alterius, the expression of certain things in a statute necessarily involves exclusion of other things not expressed. (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1391 [241 Cal. Rptr. 67, 743 P.2d 1323].) Under this rule, where a statute contains a given provision on a subject, the omission of such provision from a similar statute concerning a related subject "`"is significant to show that a different intention existed."'" (People v. Drake (1977) 19 Cal.3d 749, 755 [139 Cal. Rptr. 720, 566 P.2d 622]; and see People v. Castoe (1978) 86 Cal. App.3d 484, 489 [150 Cal. Rptr. 237]; Sonoma Subaru, Inc. v. New Motor Vehicle Bd. (1987) 189 Cal. App.3d 13, 21-22 *1584 [234 Cal. Rptr. 226].) In the case before us, the fact the Legislature failed to exclude defendants charged with drunk driving from the diversion program for the mentally retarded but specifically excluded such defendants from diversion programs applicable to the general public clearly implies, under the doctrine of inclusio unius est exclusio alterius, that the Legislature did not intend to bar diversion for mentally retarded defendants charged with drunk driving. (Cf. People v. Castoe, supra, 86 Cal. App.3d at p. 489.)
The legislative history of the relevant diversion programs and the Vehicle Code's prohibition on diversion in drunk driving cases supports the conclusion the Legislature did not intend to prohibit diversion of mentally retarded defendants charged with drunk driving.
The first of these diversion programs was added to the Penal Code in 1977 as chapter 2.7 of part II, title 6 (§§ 1001-1011). (Stats. 1977, ch. 574.) This program contained no limitations as to the type of offenders or offenses covered except it did not apply to persons convicted of drunk driving. (Former Pen. Code, § 1001.2, Stats. 1977, ch. 574, § 2; 64 Ops. Cal.Atty.Gen. 179, 181, 183 (1981).) The diversion program for the mentally retarded was added as chapter 2.8 in 1980 (Stats. 1980, ch. 1253), and has remained essentially unchanged since that time. The program contains no exception for mentally retarded defendants accused of drunk driving. Under chapter 2.7, some counties developed diversion programs referred to as "Lucky Deuce" programs. (A drunk driving charge under Vehicle Code section 23152 is commonly referred to as a "deuce.") Under the auspices of the court, the district attorney and defense counsel, first-time offenders could elect to enter a year-long "Lucky Deuce" program at their own expense. Upon successfully completing the program, the "deuce" could be reduced to reckless driving, a moving violation or even dismissed entirely in the court's discretion. The court proceedings were stayed pending completion of the program. (Sen. Jud. Comm. Rep. on Assem. Bill No. 541 (1981-1982 Reg. Sess.) pp. 7-8.) According to the Senate Judiciary Committee report, Vehicle Code section 23202 would eliminate these "Lucky Deuce" programs. (Id. at p. 7.)
The legislative history of Vehicle Code section 23202 furnished us by the Legislative Intent Service contains nothing which would indicate the Legislature had the diversion program for the mentally retarded in mind when it enacted that section. Rather, the materials imply the Legislature sought only to eliminate the "Lucky Deuce" programs. (See maj. opn., ante, p. 1576.) I note the majority cannot find any specific reference to the diversion program for the mentally retarded in the legislative history of section 23202. The best it can do to support its argument is to quote from a bill analysis prepared by the Department of Drug and Alcohol Programs which *1585 stated, "[t]he bill would prohibit any stay of proceedings with regard to [drunk driving] offenses...." (Italics added; see maj. opn., ante, p. 1577.) The majority omit the rest of the sentence which reads: "... when such stay of proceedings is to allow the accused to participate in a driver improvement program or in an alcohol/drug treatment program." Again, the clear implication is that section 23202 was intended to do away with the counties' "Lucky Deuce" programs, not with rehabilitation programs for the mentally retarded which are much more than mere "driver improvement" or alcohol/drug treatment programs.
In 1981, the Legislature enacted Vehicle Code section 23202 prohibiting diversion in drunk driving cases. (Stats. 1981, ch. 940.) In 1982, chapter 2.7, authorizing county-option diversion programs, was repealed by operation of its "sunset" provision. It was reenacted later that year by Statute 1982, chapter 42. The reenacted chapter 2.7 contained an explicit provision excluding drunk driving cases from its coverage. (Pen. Code, § 1001.2, subd. (a).) In the same year, 1982, by a different bill the Legislature added chapter 2.9 to the Penal Code (§§ 1001.50-1001.55) authorizing a county board of supervisors to adopt diversion programs for certain misdemeanors but explicitly excluding drunk driving cases. (Pen. Code, § 1001.51, subd. (b).) (Stats. 1982, ch. 1251, § 2.) In 1983, the Legislature repealed the "sunset" provision of chapter 2.8, the diversion program for the mentally retarded. (Stats. 1983, ch. 1215, § 1.)
The close connection between Penal Code chapters 2.7, 2.8 and 2.9 and Vehicle Code section 23202 makes it difficult to attribute the lack of a drunk driving restriction in chapter 2.8 to legislative inadvertence. (Cf. People v. Drake, supra, 19 Cal.3d at p. 755.) It is assumed the Legislature has existing laws in mind when it passes a statute. (Estate of McDill (1975) 14 Cal.3d 831, 837 [122 Cal. Rptr. 754, 537 P.2d 874].) Although this assumption may not always comport with reality, it is particularly applicable in this case where all three diversion programs and the Vehicle Code section were enacted in contiguous legislative sessions, addressed the same subject and passed through the same legislative committees, the Assembly Criminal Justice Committee and the Senate Judiciary Committee. Clearly in this instance the Legislature was aware of the intimate relationship between the sections of the Penal Code establishing diversion programs and the section of the Vehicle Code prohibiting diversion programs. (Cf. People v. Drake, supra, 19 Cal.3d at p. 755.)
Not only was the Legislature aware of the relationship between the code sections, its failure to amend chapter 2.8, the diversion program for the mentally retarded, to exclude drunk driving cases at the time it excluded drunk driving cases from the chapters 2.7 and 2.9 diversion programs indicates *1586 an intent to treat the mentally retarded differently from the general public with respect to diversion in drunk driving cases. It is a fundamental rule of statutory construction "`failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended.'" (Estate of McDill, supra, 14 Cal.3d at pp. 837-838.) The Legislature's enactment of a prohibition on diversion in drunk driving cases in chapters 2.7 and 2.9 in the face of a corresponding failure to amend chapter 2.8 to include the same prohibition strongly indicates the Legislature did not intend such a prohibition to apply to the diversion program for the mentally retarded. (Cf. People v. Olsen (1984) 36 Cal.3d 638, 647 [205 Cal. Rptr. 492, 685 P.2d 52].) The omission of a corresponding amendment to chapter 2.8 is also consistent with the fact chapter 2.8 does not focus on the nature of the crime but on the nature of the offender. (See ante, at p. 1582.)
Diversion of mentally retarded drunk driving defendants is not inconsistent with legislative efforts to protect society from the "horrific risk posed by those who drink and drive." (Burg v. Municipal Court, supra, 35 Cal.3d at p. 262.) Quite the contrary. The diversion program at issue here is consistent with the Legislature's recognition mentally retarded misdemeanants and society as a whole may derive greater benefit from diversion than from mainstream criminal prosecution. The Legislature has long recognized that mental retardation presents unique social, medical and legal problems. (See Welf. & Inst. Code, § 4501.) As a result, "[t]he Legislature has enacted a comprehensive statutory scheme ... to provide a `pattern of facilities and services ... sufficiently complete to meet the needs of each person with developmental disabilities....' Such services include ... on an individual basis, selecting and providing services to meet such needs...." (Association for Retarded Citizens v. Department of Developmental Service (1985) 38 Cal.3d 384, 388 [211 Cal. Rptr. 758, 696 P.2d 150].) If the trial court finds a mentally retarded defendant would benefit by diversion, the defendant receives a supervised treatment program "which is individually tailored to the needs of the defendant ... and which includes, but is not limited to, treatment specifically addressed to the criminal offense charged." (Pen. Code, § 1001.20, subd. (f).) The treatment is provided by a state treatment center specializing in problems of the mentally retarded. Supervision is accomplished by progress reports from the treatment center to the court and prosecutor every six months. (Pen. Code, § 1001.23, subd. (c).) If the defendant's progress is unsatisfactory, the court may modify the program or reinstitute the criminal proceedings. (Pen. Code, § 1001.29.)
As noted above, the People, joined by the majority of this court, argue such a diversion program is unnecessary for mentally retarded drunk *1587 drivers because the same treatment can be ordered as a condition of probation after conviction. The facts in Mr. Weatherill's case refute this argument. Mr. Weatherill was previously convicted of drunk driving in 1984. Although the terms of probation on that conviction are not included in our record, it is obvious they were ineffective in preventing a repeat offense. In the present case imposition of sentence was suspended and Mr. Weatherill was placed on summary probation on terms that included nine days in jail, a fine and the routine terms imposed in drunk driving cases. The only condition having any relationship to Mr. Weatherill's particular problem was a requirement he attend 24 Alcoholics Anonymous meetings. The contrast between the terms of Mr. Weatherill's probation and the terms for diversion under chapter 2.8 of the Penal Code is striking. (See ante, at p. 1585.) Thus, notwithstanding the theoretical availability of specialized treatment for mentally retarded persons convicted of drunk driving, the facts of this case demonstrate such persons are treated the same as other convicted drunk drivers. There is no special attention given to their unique problems as there would be if diversion were ordered.
It seems to me the outcome the majority reaches in this case, affirmance of Mr. Weatherill's sentence, is inconsistent with the deep concern the majority and I share over the loss of lives, injuries and property damage caused by drunk drivers. Although the majority cites trial court discretion in sentencing to prescribe treatment programs and the state's obligation to provide appropriate services to the mentally retarded (maj. opn., ante, p. 1580.), it is obvious from Mr. Weatherill's case these concepts have no meaning in the real world of the criminal courts. Mr. Weatherill received the same sentence an unimpaired defendant would have received. Even if we were to accept the majority's resolution of the conflict between the statutes on preconviction diversion of mentally retarded drunk drivers, at the very least, this case should be remanded to the trial court with instructions to resentence Mr. Weatherill in accordance with his special needs as a mentally retarded substance abuser.
In any event, no matter what a trial court may be empowered to do with mentally retarded drunk drivers after they have been convicted the issue of what the law allows judges to do with these defendants before they are tried remains a live issue. Implicit in the majority opinion is the policy assumption the Legislature feels jail is always the best deterrent for all defendants. Thus, when the Legislature enacted Vehicle Code section 23202 it was saying we are going to deter drunk driving by imposing jail time on all those who are caught committing that crime. It follows if the Legislature thought jail was the best way of deterring drunk driving why should we exempt mentally retarded drunk drivers from that deterrent. When drunk, they are *1588 just as dangerous on the highways as those of normal intelligence. So why should they be treated differently.
But Penal Code section 1001.20 was enacted not as an act of kindness to the mentally retarded. It was enacted because the Legislature felt imprisonment was ineffective as a deterrent for that class of defendants  or at least some substantial number within that class. Presumably many in that class have difficulty even comprehending the link between crime and punishment. So in order to reduce the frequency of crime committed by mentally retarded people the Legislature authorized a more effective approach  a comprehensive system of educational and support services calculated to reach the retarded in ways a few days or a few months in a jail cell never could. If treatment is better than jail as a means of reducing crime for mentally retarded people who commit other misdemeanors why is it not the better way when the crime is drunk driving.
So once again it is possible to reconcile the two statutes in a way which supports pretrial diversion of mentally retarded individuals accused of drunk driving. The underlying policy assumptions are not in conflict. On the one hand, the Legislature decided the best way to reduce the level of drunk driving is to impose the deterrent of imprisonment on all defendants capable of responding to that deterrent. Yet it is not inconsistent with that purpose for the Legislature to have decided the best way to reduce the level of drunk driving among the mentally retarded is not to automatically inflict punishment which would not deter them but to put them in a special comprehensive program better calculated to prevent them from repeating this crime. So under Penal Code section 1001.20 it left to the discretion of the court to determine in each case whether a given defendant is suffering from a degree and type of mental retardation which makes jail less effective than treatment as a means of reducing the defendant's chances of drunk driving in the future. This makes sense as a policy matter as a way of reducing drunk driving by members of this class of citizens and is a sensible way of interpreting the legislative intent which created the ostensible conflict between Penal Code section 1001.20 and Vehicle Code section 23202.
So this completes the case for the other side. As mentioned earlier, I find it more persuasive than the majority's interpretation, although only marginally so.
There is a tendency among appellate judges in writing their opinions, and I am as guilty of this as any other, to discuss tough cases as if they were easy, to characterize debatable answers as being obvious, and to write up razor thin cases as if a vast chasm separates the correct from the incorrect *1589 result. We may spend days in the quiet of our chambers trying to formulate our individual positions on a close question, then hours arguing among ourselves, and along the way shift our views to and fro several times. Yet when we finally get around to writing the opinion we inform the reader it was a piece of cake. Logic, precedent and principle all pointed in a single direction and the result we reached was inevitable.
Well, in all candor I do not regard the instant case as easy, the answer obvious, or the result inevitable. If nothing else, I hope this dissent exposes the depth of our problem. This time the Legislature has handed us a true conundrum.
Appellant's petition for review by the Supreme Court was denied March 15, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.
NOTES
[1] Unless otherwise noted all statutory references are to the Vehicle Code.
[2] See Welfare and Institutions Code section 4500 et seq.
[3] Defendant had apparently been involved in a one-vehicle accident.
[4] "(a) If any person is convicted of a violation of Section 23152 or 23153, the court shall not stay or suspend pronouncement of sentencing and shall pronounce sentence in conjunction with the conviction in a reasonable time, including time for receipt of any presentence investigation report ordered pursuant to Section 23205."
[5] For many years when driving under the influence was prohibited by section 502, and later by section 23102, a drunk driving violation was known as a "deuce."
[6] AB 541 passed the Assembly Criminal Justice Committee by a vote of 13-0, the Assembly Ways and Means Committee 21-0, the Senate Judiciary Committee 7-0, the Assembly floor 77-0, and the Senate Floor 34-0. (LIS, PE-62.) It was signed by the Governor and filed with the Secretary of State on September 29, 1981.
[7] As the dissent correctly observes: "When, as here, the defendant is both mentally retarded and charged with driving under the influence of alcohol, the two sections are in conflict. One of them has to give way."
[8] The dissent confuses the subject matter of a statute with the size of the class affected by the statute, and thereby erroneously concludes that the specific-general issue is a stalemate.
[9] With logic that eludes us, the dissent avoids this controlling principle by contradictorily stating both: "... the two sections are in conflict. One of them has to give way" (dis. opn., post, p. 1581) and "the statutes can be reconciled." (Dis. opn., post, p. 1583.)
[10] Defendant apparently sought no special habilitation or treatment. Foregoing even a probation report, he was, pursuant to his plea bargain, placed on summary probation.