Filed 2/28/25  P. v. Hernandez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERTO DELOYA HERNANDEZ,<br><br>　　Defendant and Appellant. | B333301<br><br>(Los Angeles County<br>Super. Ct. No. MA081703) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed with directions.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Roberto Deloya Hernandez of second degree murder, gross vehicular manslaughter while intoxicated, and other offenses. On appeal, he contends insufficient evidence supports the convictions and the court gave an erroneous jury instruction and miscalculated his presentence custody credit. We agree with only the last contention, and thus affirm the judgment with directions.

## BACKGROUND

Around 1:00 a.m. on July 16, 2021, Hernandez was driving northbound on the 14 Freeway at close to 100 miles per hour in his Buick Enclave. Humberto Balderrama and his wife, Maria Hernandez Reyes, were going in the same direction in their Chevrolet pickup truck, driving at the speed limit. Hernandez's vehicle struck Balderrama's truck from behind, causing it to flip and killing Balderrama.

California Highway Patrol (CHP) Officer Orlando Cisneros gave Hernandez three field sobriety tests and concluded he was under the influence of alcohol. Cisneros then performed two in-field preliminary alcohol screening (PAS) breathalyzer tests, which returned blood alcohol concentration results of 0.114 percent on the first test and 0.108 percent on the second.

Officer Cisneros arrested Hernandez and transported him to a sheriff's station, where two chemical breath tests reported

2

that his blood alcohol concentration was 0.09 percent on the first test and 0.08 percent on the second.

No autopsy was performed. The coroner's report documented Balderrama's injuries but drew no conclusion as to the cause of death.

The District Attorney of Los Angeles County charged Hernandez with: (1) murder (Pen. Code, § 187, subd. (a))[1]; gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)); driving under the influence of alcohol causing injury (Veh. Code, § 23153, subd. (a)); driving with a 0.08 percent blood alcohol content causing injury (Veh. Code, § 23153, subd. (b)); driving when privilege suspended or revoked for DUI conviction (Veh. Code, § 14601.2, subd. (a)); and driving a vehicle not equipped with an ignition interlock device when privilege restricted (Veh. Code, § 23247, subd. (e)).

The district attorney further alleged: Hernandez inflicted great bodily injury within the meaning of section 12022.7, subdivision (a); the offenses involved great violence [and] great bodily harm, . . . disclosing a high degree of cruelty, viciousness, and callousness; Hernandez suffered prior convictions that were numerous and of increasing seriousness; and Hernandez was on probation or parole when he committed the offenses.

Hernandez initially pleaded not guilty and denied the special allegations but later pleaded guilty to driving when his

---

[1] All undesignated statutory references are to the Penal Code.

3

privilege was suspended and driving without an ignition interlock device, both misdemeanors.

## PRETRIAL

Before trial on the remaining counts, defense counsel objected to admission of coroner's photographs of Balderrama, arguing they would be unduly prejudicial given that the defense intended to stipulate that the collision caused Balderrama's death. However, apparently through inadvertence, no stipulation was ever made.

The parties stipulated that in 2009, and 2017 a court read to Hernandez and he understood the following. "Being under the influence of alcohol or drugs or both impairs his ability to safely operate a mother vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. If he continues to drive while under the influence of alcohol or drugs or both, and as a result of that driving someone is killed, he can be charged with murder."

Hernandez moved in limine to exclude the PAS breathalyzer results pursuant to Evidence Code section 402 on the ground they were unreliable and irrelevant for purposes of determining blood alcohol content. The trial court deferred ruling on the motion pending the prosecution establishing a foundation at trial for Hernandez's PAS results.

## TRIAL

At trial, Joshua Greengard, a CHP Officer and PAS coordinator, testified as to the operation and accuracy of a PAS breathalyzer machine. He stated the machines were accurate to within plus or minus 0.01 percent, and results would be valid

only if two back-to-back tests produced results within 0.02 percent of each other.  Greengard testified that two days before the accident and five days after it, he performed accuracy tests on the breathalyzer machine that Officer Cisneros used to test Hernandez.

Reyes testified she and Balderrama, who was driving, were traveling at the speed limit of 65 miles per hour in the right-hand lane at the time of the accident.  She "was observing [Balderrama] the whole time, talking with him, and he was very at ease."  Reyes said, "I was chitchatting with him.  And I remember I was keeping an eye on the cars that were moving along quickly.  [¶]  My husband said, 'Look at those cars, how hard they are driving.  And we need to arrive in a good state for our children.  That's why I always drive at the limit.' "  Reyes testified: "I didn't see any lights approaching.  I just felt a strong impact, and I felt a hard blow to the back of my head.  I never lost consciousness.  We wound upside-down.  I managed to unbuckle myself.  And I was telling [Balderrama] to wake up, and he wasn't waking up."

Reyes testified that Balderrama did not swerve or change lanes before the accident, she was "chitchatting" with him when the accident occurred, and she felt the impact from his side of the vehicle.

At one point in her testimony, the prosecutor asked Reyes how her husband had died.  She responded, "Somebody who, apparently is driving under the influence—."  Defense counsel objected, after which Reyes added, "—struck us."  The court sustained the objection and ordered the testimony stricken.

Scotty Southwell, who had stopped to help, testified he joined "several people" offering assistance to Balderrama and

5

Reyes.  He could not locate a pulse on Balderrama at the scene.  Southwell testified that Hernandez emitted a strong odor of alcohol and was incoherent and babbling.

Officer Cisneros testified that when he arrived on the scene there were "multiple parties pulled over on the right shoulder" and "multiple" "passing motorists" who had stopped to help, eight of whom reported having seen the crash.  Balderrama appeared to be lifeless in his truck, which had suffered heavy damage focused on the front right side.

Hernandez reported to Cisneros that he had no medical conditions, took no medications prior to the collision, and had slept approximately eight hours the previous night.  He stated he had consumed two two-ounce glasses of wine while at work, between 6:00 and 6:30 p.m., approximately five hours before the accident.

While speaking with Hernandez, Officer Cisneros detected the odor of alcohol and noted his speech was slightly slurred and his eyes were red and watery.  Considering these to be "objective signs . . . of alcohol impairment," Cisneros gave Hernandez three field sobriety tests.

The first, a horizontal gaze nystagmus test, was designed to identify six signs of intoxication (three for each eye) due to involuntary jerking in the eye as a result of higher blood alcohol levels:  Lack of smooth pursuit, in which the eye fails to track a stimulus without jerking; "reveal," "sustained" and "extreme" nystagmus, where the eye continues to jerk while holding on a stimulus at the far end of the subject's peripheral vision; and "onset" nystagmus, where the eye begins to jerk before the stimulus has drawn the gaze 45 degrees from center.  Cisneros

6

testified that the presence of any four signs would indicate that the subject was over the legal limit of intoxication.

Hernandez tested positive for each of the three tests in each eye, for a total of six signs that he was over the legal limit.

Officer Cisneros also had Hernandez perform a straight-line walk-and-turn test, during which Hernandez started the test before instructed to do so and twice stepped off line, both indicators of possible intoxication. Cisneros had Hernandez stand on one leg for 30 seconds, but he put his foot down at 23 seconds, an indicator of possible intoxication. Hernandez's inability to successfully complete these tests led Cisneros to conclude he was under the influence of alcohol.

At 2:50 a.m., at approximately 2 hours after the accident, Cisneros performed two in-field PAS tests, three minutes apart, using an Intoximeter Alco-Sensor IV "breathalyzer" machine bearing serial number 049704. Hernandez displayed an alcohol concentration of 0.114 percent on the first test and 0.108 percent on the second. Defense counsel renewed her in limine objection to admission of the PAS results but the court found the prosecution had laid a "more than sufficient foundation" to admit the results both as evidence of the presence of alcohol and for the numerical values reported.

Based on his observations and the PAS tests, Officer Cisneros believed that Hernandez was under the influence of alcohol, arrested him, and transported him to the sheriff's station. There, Cisneros administered chemical breath testing using a DataMaster DMT breath testing instrument. The first test, taken at 3:47 a.m., registered a 0.09 percent alcohol level; the second, taken three minutes later, registered a 0.08 percent

alcohol level. Cisneros did not identify the DataMaster's serial number. Defense counsel offered no objection to this evidence.

Jennifer De la Cerda, a sheriff's department criminalist and expert in forensic alcohol analysis, testified about alcohol impairment and testing. She testified that impairment for driving begins for some people at a blood alcohol level of 0.05 to 0.07 percent, and for everyone at 0.08 percent. De la Cerda opined that Hernandez's DataMaster results were accurate, and a subject exhibiting the same alcohol levels would be impaired to drive a motor vehicle safely.

The prosecutor posed De la Cerda a hypothetical in which a subject displayed signs of intoxication in field sobriety tests and had PAS results of 0.11 and 0.10 percent, then an hour later had blood alcohol readings from chemical testing at 0.09 and 0.08 percent. De la Cerda testified she could not opine that the individual was impaired based solely on the field sobriety tests, as other conditions such as age, medical condition, physical coordination and weight could cause a sober person to exhibit signs of impairment in those tests. However, De la Cerda opined that based on the chemical testing alone, the individual would be impaired to drive a motor vehicle safely at the time of driving. De la Cerda offered no opinion about the PAS tests. (We will discuss De la Cerda's testimony in more detail below.)

Highway Patrol Officer Phillip Kasinger, an investigator with the state's Multidisciplinary Accident Investigation Team, testified that he investigated the accident scene and observed extensive damage to Balderrama's truck caused by its being struck "rear-to-front" by Hernandez's Buick with a great deal of force. The roof on the truck was caved in, and the Buick suffered extensive damage to the front passenger side. Kasinger testified

8

that Hernandez's cruise control was activated when the collision occurred.

Officer Kasinger downloaded data from both vehicles' event data recorders (essentially their "black boxes"), which indicated Hernandez's Buick was traveling at 96 miles per hour 0.5 seconds before the collision, its brakes had not been applied prior to that time, and no "steering event" had occurred.

The data showed that three seconds before the collision, Balderrama's truck was traveling at approximately 72 miles per hour, but dropped to 65 miles per hour within one second before the collision. Officer Kasinger testified that the truck's data showed that some kind of "non-deployment event" occurred just before the collision, but data specifying the nature of that event was "overridden" when the collision occurred.

Officer Kasinger testified he could arrive at no opinion as to the cause of the collision.

The prosecution offered no coroner or medical records, nor any other medical evidence reflecting the physiological cause of Balderrama's death.

For the defense, Babak Malek, an accident reconstruction expert, testified that Hernandez's Buick and Balderrama's truck collided at a 4.4 degree angle, but none of the vehicle data established the cause of the accident. The data from the Buick indicated Hernandez did not change direction before the accident, as there was no "steering" or "swerving" data. Malek therefore surmised it was possible that Balderrama, not Hernandez, caused the collision by moving into the number two lane while slowing, or by suddenly slowing in the right half of the number

9

three lane while Hernandez approached in the left half of the same lane.

In closing argument, defense counsel focused on insufficient evidence showing that Hernandez caused the collision, arguing that to establish guilt, the jury had to find appellant was the "cause of this accident, the cause of this death."

The court instructed the jury on second-degree murder pursuant to then-current CALCRIM No. 520, in pertinent part as follows:

"To prove that the defendant is guilty of [murder], the People must prove that, one, the defendant committed an act that caused the death of another person. And two, when the defendant acted, he had a state of mind called malice aforethought." The defendant had "[i]mplied malice if, one, he intentionally committed the act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life[;] and four, he deliberately acted with conscious disregard for human life."

The jury convicted Hernandez on all counts, and the court sentenced him to 18 years to life in prison.

## DISCUSSION

Hernandez contends insufficient evidence supports his convictions because no evidence establishes that he was impaired to drive or had a blood alcohol content of at least 0.08, that he caused the collision with Balderrama, or that the collision caused Balderrama's death. He also contends the trial court improperly instructed the jury on implied malice and miscalculated his custody credits.

10

## A. Substantial Evidence Supports the Convictions

### 1. Evidence of Impairment and Intoxication

Hernandez argues his convictions must be reversed because insufficient evidence supported a finding that he was driving while impaired or with a blood alcohol content of 0.08 at the time of the accident. This is so, he argues, because the prosecutor failed to adduce any evidence that the DataMaster instrument Officer Cisneros used in the sheriff's station was the same instrument that De la Cerda certified at trial, and thus no substantial evidence established that the instrument was reliable or properly calibrated or maintained.

Hernandez also argues the DataMaster results should have been excluded for lack of foundation.

We disagree with both arguments.

#### a. Relevant Proceedings

Officer Cisneros testified that at 3:47 and 3:50 a.m., he used a DataMaster instrument at the sheriff's station to test Hernandez's breath samples. The results indicated Hernandez had a blood alcohol level of 0.09 and 0.08 percent, respectively.

Cisneros did not identify the DataMaster instrument by serial number.

Sheriff's criminalist De la Cerda testified she was familiar with the DataMaster breath instrument "used in this case," which she identified as instrument number 300202.

De la Cerda testified that a printed breath alcohol report from instrument number 300202, which was designated People's exhibit 8, reflected that the instrument analyzed two breath samples at approximately 3:45 a.m. on July 16, 2021, reporting results of 0.09 the first time and 0.08 the second. The report was also uploaded to De la Cerda's own computer, but with additional

11

decimal places reported. De la Cerda testified that the information in her "logs" matched that reported in exhibit 8.

Defense counsel objected to exhibit 8 on the ground that De la Cerda could not authenticate it because the printout had been delivered to Officer Cisneros, not to De la Cerda. The court sustained the objection and excluded the printout, observing that De la Cerda could authenticate the results sent to her own computer but not the printout itself.

Although defense counsel objected to exhibit 8, she represented she was not contending "that [De la Cerda's] testimony or anybody's testimony [was] off in numbers."

De la Cerda testified that each of the 80 DataMaster instruments used by the Sheriff's Department in Los Angeles County would perform an accuracy test on itself every Monday at 1:00 p.m. by measuring an internal standard sample three times. If the measurement was accurate to within plus or minus 0.01 percent in each of the three readings, the instrument would be deemed accurate and stay in service. Results of these accuracy checks were automatically transmitted to De la Cerda's lab, where a technician would verify them.

The instruments would also automatically self-test during the interval between the two tests conducted by law enforcement on a person suspected of driving under the influence of alcohol. If the self-test failed, the instrument would abort the breath testing and report an error code.

De la Cerda testified that according to her records, DataMaster number 300202 conducted these self-diagnostics four days before and four days after the accident, as well as in the interval between the two tests Officer Cisneros performed on

12

Hernandez, and all tests indicated the instrument was performing correctly.

Given these results, De la Cerda opined that the July 16 test results were accurate. She further opined that the subject of the test would have been impaired to drive a motor vehicle safely.

### b. Legal Principles

### 1. Elements of the Offenses

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was . . . the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence . . . ." (§ 191.5, subd. (a).) Gross negligence is the exercise of so slight a degree of care as to exhibit a conscious indifference or "I don't care" attitude concerning the ultimate consequences of one's conduct. (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036-1038.)

The phrases "intoxicated" and "under the influence" mean the alcohol "must have so far affected the nervous system, the brain, or muscles as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1193.) "[E]vidence of actual impairment may include the driver's appearance, an odor of alcohol, slurred speech, impaired motor skills, slowed or erratic mental processing, and impaired memory or judgment." (*Id.* at p. 1198; see also *Baker v. Gourley* (2002) 98 Cal.App.4th 1263, 1264 ["a jury . . . could certainly conclude . . . that a driver was

13

intoxicated based on such indicia as slurred speech and an unsteady gait without a valid chemical test"].)

Second degree murder "is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' [Citation.] ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) "[A]cts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement." (*Id.* at p. 989.) "[T]he defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Ibid.*)

A drunk driver may be convicted of second degree murder on a theory of implied malice. (*People v. Watson* (1981) 30 Cal.3d 290, 300-301 (*Watson*).) When a defendant commits homicide while driving under the influence of alcohol, malice may be implied where the defendant's blood-alcohol level was above the 0.08 percent legal limit, the defendant evinced an intent before drinking to drive, the defendant knew the hazards of driving

14

while intoxicated, and the defendant drove in a highly dangerous manner.  (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.)

## 2. Admissibility and Sufficiency of DataMaster Evidence

A breath test to determine blood alcohol concentration is admissible if "(1) the particular apparatus utilized was in proper working order, (2) the test used was properly administered, and (3) the operator was competent and qualified."  (*People v. Adams* (1976) 59 Cal.App.3d 559, 561.)  "Absent a controlling statute, the test results must be interpreted at the trial by an expert witness [citation], under the general requirements for expert testimony." (*Ibid.*)  A result of "0.10 [now 0.08] percent or more by weight of alcohol in the blood gives rise to the presumption that the person was under the influence of intoxicating liquor." (*Ibid.*)  The requirements for admissibility may be satisfied "upon either a showing of compliance with . . . title 17 [of the California Code of Regulations] or independent proof of the three elements." (*People v. Williams* (2002) 28 Cal.4th 408, 414; see also *Adams*, at p. 567.)

## 3. Standard of Review

"A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.  Once such evidence is found, the substantial evidence test is satisfied.  [Citation.]  Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding."  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

15

Substantial evidence may consist of inferences based on evidence, logic and reason in light of the whole record.  (*People v. Wilson* (2005) 36 Cal.4th 309, 331.)  Substantial evidence based on inferential reasoning must not be based on suspicion, imagination, speculation, supposition, surmise, conjecture, or guesswork, but rather "must be an inference drawn from evidence . . . ."  (*People v. Davis* (2013) 57 Cal.4th 353, 360.)  "We must accept all logical inferences that the jury may have drawn from circumstantial evidence.  [Citation.]  'If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'  [Citation.]  It is well settled that ' "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon *no hypothesis whatever* is there sufficient substantial evidence to support" ' the jury's verdict." ' "  (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411.)

We review a trial court's admission of evidence for abuse of discretion.  (*People v. Helzer* (2024) 15 Cal.5th 622, 627.)  We will reverse a judgment based on improperly admitted evidence only if the appellant can show that if the evidence had been excluded, he would have enjoyed a more favorable result.  (See *People v. Epps* (2001) 25 Cal.4th 19, 29; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### c.     Analysis

As noted above, when a defendant commits homicide while driving under the influence of alcohol, malice may be implied where the defendant's blood-alcohol level was above the 0.08 percent legal limit, the defendant evinced an intent before drinking to drive and knew the hazards of driving while

16

intoxicated, and the defendant drove in a highly dangerous manner.

Hernandez does not contest the evidence establishing he evinced an intent to drive before drinking, knew the hazards of doing so, and drove at high speeds. Neither does he dispute that Cisneros was qualified to administer the DataMaster test and did so properly, nor that De la Cerda was qualified to interpret the DataMaster results at trial. Hernandez contends only that the evidence was insufficient to establish his blood-alcohol level was above the 0.08 percent legal limit because no evidence identified the DataMaster instrument certified by De la Cerda at trial as the same instrument Cisneros used to test Hernandez. We disagree.

De la Cerda was asked, "Are you familiar with the DataMaster breath instrument *used in this case*?" (Italics added.) She responded, "Yes," and testified about the instrument's self-diagnostics. This evidence alone established that De la Cerda certified the same instrument Cisneros used to test Hernandez, irrespective of Cisneros's failure to identify the instrument by number.

Even assuming De la Cerda was not speaking about the specific instrument Cisneros used to test Hernandez, and meant only that she was familiar with DataMaster instruments generally, she testified that all of the sheriff's DataMasters in Los Angeles County automatically conducted the same self-diagnostic protocol both every Monday at 1:00 p.m. and during the interval between two breath tests on any real subject. The instruments all reported results of these diagnostics to De la Cerda's lab, where they were checked by technicians. De la Cerda testified that if an instrument failed the self-diagnostic during a real test,

17

it would abort the test and report an error code.  Officer Cisneros did not mention receiving an error code when he tested Hernandez.

Thus, De la Cerda's testimony applied to all sheriff's DataMaster instruments in Los Angeles County, including the one Cisneros used to test Hernandez.  Her testimony indicated that any inaccurate instrument would either be flagged after failing a weekly self-diagnostic or would abort a real-time test and give an error code.  Because Cisneros was able to complete his test on Hernandez without an error code, the trial court could reasonably infer the instrument was in proper working order, satisfying the *Adams* requirements for admission of the DataMaster results.

From the DataMaster results, the finder of fact could reasonably conclude Hernandez's blood alcohol level was at least 0.08 at the time of the accident.

Even without the DataMaster results, substantial evidence supported the jury's findings that Hernandez was impaired to drive and had a blood alcohol level of at least 0.08.  Southwell testified that immediately after the accident, he smelled a strong odor of alcohol on Hernandez, who was babbling and incoherent.  Officer Cisneros reported that Hernandez showed objective signs of intoxication including exhibiting nystagmus and failing to complete the field sobriety tests satisfactorily, and had in-field alcohol levels of 0.114 and 0.108 percent.[2]  De la Cerda testified

---

[2] Hernandez does not contend the Alco-Sensor IV used by Cisneros was unreliable, that Cisneros was not competent to operate it, or that he administered the test improperly.

18

that everyone with a blood alcohol level of 0.08 or greater is impaired from driving a motor vehicle safely.

This evidence supported the jury's conclusion that Hernandez was intoxicated and impaired to drive. (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 266, fn. 10 ["both parties may . . . adduce other circumstantial evidence tending to establish that the defendant did or did not have a 0.10 [now 0.08] percent blood-alcohol level while driving"]; *McKinney v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 519, 526, fn. 6 [" 'Evidence regarding the manner in which a defendant drove, performed field sobriety tests, and behaved is admissible and relevant as tending to establish that he did or did not have a 0.10 [now 0.08] [blood alcohol level] while driving' "].)

Therefore, substantial evidence supported Hernandez's convictions irrespective of the DataMaster results.

Hernandez argues that De la Cerda testified that Officer Cisneros's "FST and PAS [field sobriety test and preliminary alcohol screening] testimony" was not sufficient to establish impairment. He is incorrect. De la Cerda testified she could not opine that an individual was impaired based solely on the results of a *field sobriety test*, as other conditions such as age, medical condition, physical coordination and weight could cause a sober person to exhibit signs of impairment. De la Cerda said nothing about the PAS results, and there was no testimony that she considered a PAS test to be a "field sobriety test."

### d.    Prejudice

Hernandez argues that erroneous admission of the DataMaster results was prejudicial.

As discussed, De la Cerda's testimony laid the foundation for the DataMaster results. But even if they lacked foundation

19

and were improperly admitted, reversal is required only if Hernandez can show that if the results had been excluded, he would have enjoyed a more favorable result. He can make no such showing.

As discussed above, substantial evidence other than the DataMaster results supported the conviction: A witness testified Hernandez smelled of alcohol at the scene of the accident and was babbling and incoherent; Officer Cisneros reported that Hernandez showed objective signs of intoxication, including exhibiting nystagmus and failing to complete the field sobriety tests satisfactorily, and was measured to have in-field alcohol levels of 0.114 and 0.108 percent; and De la Cerda testified that an individual with a 0.08 level of alcohol in his blood would be impaired from driving a motor vehicle safely.

Where field sobriety tests and breathalyzer results indicated that Hernandez's blood alcohol levels were at least 0.08 percent two hours after the accident, nothing suggests that DataMaster results reflecting a 0.09 and 0.08 percent blood alcohol levels three hours after the accident tipped the balance for the jury from acquittal to conviction. Therefore, Hernandez cannot show that if the DataMaster results had been excluded, he would have enjoyed a more favorable result.

### 2. Evidence on the Cause of the Collision

Hernandez argues his convictions must be reversed because insufficient evidence established that he caused the collision that killed Balderrama. We disagree.

### a. Legal Principles

Both murder and manslaughter require proof that the defendant's actions caused the death of the victim. (§§ 187, 189, 192, subd. (c)(1); *People v. Concha* (2009) 47 Cal.4th 653, 660-

20

662.)  In a homicide case, causation is established by proving that an act of either the defendant or an accomplice proximately caused the death.  (*People v. Carney* (2023) 14 Cal.5th 1130, 1137-1138; *People v. Wilson* (2013) 219 Cal.App.4th 500, 509 [gross vehicular manslaughter requires proof the defendant's act killed the victim].)  " 'Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless " 'undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus.' " [Citation.]  A jury's finding of proximate causation will be not disturbed on appeal if there is "evidence from which it may be reasonably inferred that [the defendant's] act was a substantial factor in producing" the death.' "  (*People v. Jones* (2024) 105 Cal.App.5th 83, 90.)

### b.    Analysis

Here, uncontradicted evidence established that when the accident occurred, Balderrama was driving in his lane at the speed limit.  Hernandez drove into Balderrama's vehicle at 96 miles per hour, making no attempt either to brake or steer away.  This constitutes substantial evidence that Hernandez caused the accident.

Hernandez argues evidence indicates that Balderrama must have swerved, turned, or drifted into Hernandez's path.  This is so, he argues, because Reyes testified that before the collision, she saw no headlights approaching from behind, which established that the two vehicles were in parallel lanes and could not have collided unless one of them drifted into the other's lane.  However, Hernandez argues, Malek testified that Hernandez's vehicle recorded no steering event.  Therefore, Balderrama must have veered into his lane.  We disagree.

21

Reyes, the only person to testify regarding any vehicle's position before the accident, stated Balderrama neither swerved, turned, nor changed lanes.

That Hernandez's vehicle recorded no steering event does not mean he stayed in his lane. Substantial evidence includes reasonable inferences drawn from the evidence. (*People v. Wilson*, *supra*, 36 Cal.4th at p. 331; see *People v. Lucero*, *supra*, 41 Cal.App.5th at p. 411 ["We must accept all logical inferences that the jury may have drawn from circumstantial evidence"].) From Reyes's testimony that Balderrama stayed in his lane, the jury could infer that Hernandez drifted into Balderrama's lane, even without actively steering.

Hernandez identifies several factors that could have established causation and argues that because evidence of those factors is lacking here, causation cannot be established. For example, he observes he made no admission as to causation at the scene or at trial; no expert or other witness could determine the cause of the collision; there was no affirmative evidence that Hernandez could have avoided Balderrama, who was going slower than traffic; Balderrama's vehicle data, which was overridden when the collision occurred, reflected some kind of "non-deployment event" just before the crash, which might have shed light on the cause of the accident; and no independent witnesses testified that Hernandez caused the collision.

In light of our standard of review and the substantial factor test that governs the determination of causation, however, none of these considerations defeats the jury's verdict. Our inquiry examines only whether substantial evidence supports the jury's finding that Hernandez's conduct was a substantial factor in

causing Balderrama's death.  Once such evidence is found, the nonexistence of confirming evidence is immaterial.

### 3.     Evidence on the Cause of Death

Hernandez argues his convictions for murder and manslaughter must be reversed because no medical evidence established that the accident caused Balderrama's death.  We disagree.

Accident data retrieved from Hernandez's and Balderrama's vehicles indicated that Hernandez's Buick struck Balderrama's truck at a speed differential of 31 miles per hour while both were traveling at high speeds.  Observations by Reyes and other witnesses indicated the collision was of sufficient force to cause Balderrama's truck to flip and sustain substantial damage.  Reyes testified that Balderrama was alert and responsive immediately before the accident and nonresponsive immediately after it.  First responders testified Balderrama was dead within moments after the accident.

The evidence thus established that Balderrama was alive immediately before the accident, which was of catastrophic force, and died immediately after it.  This evidence supports the jury's reasonable inference that the collision proximately caused Balderrama's death.

Hernandez argues the evidence was insufficient to establish the cause of Balderrama's death because the prosecution presented no medical evidence such as a coroner's report.  We disagree.

Although the parties contemplated stipulating that the collision caused Balderrama's death, and in light of that intention, the prosecution put on no medical evidence, the other evidence discussed above, including the testimony of Reyes and

23

first responders, supported the reasonable conclusion that the collision proximately caused the death.

Hernandez argues without explanation or citation to authority that medical evidence is necessary to establish a cause of death as a matter of law.

This argument conflates proximate and medical causation. "In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' [Citation.] In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.)

Medical causation concerns only the physiological mechanism leading to death, not whether an outside actor was a substantial factor in bringing about the mechanism. (See *People v. Thomas* (2012) 53 Cal.4th 771, 802 [nothing in an autopsy report or medical evidence implicated the defendant as the person who shot a peace officer who died of gunshot wounds].)

In *Thomas*, the defendant shot and killed a police officer. An autopsy was performed but the person who performed it was deceased at the time of trial, and a forensic pathologist was called to testify about the results of the autopsy. The defendant contended the autopsy report and testimony constituted testimonial hearsay, the admission of which violated his constitutional right to confront the witnesses against him. (*People v. Thomas*, *supra*, 53 Cal.4th at p. 802.) Our Supreme Court held that any error was harmless beyond a reasonable doubt because the fact and cause of the officer's death were

24

sufficiently established by an admission by the defendant and the testimony of two eyewitnesses, evidence which, the Court held, "overwhelmingly supported the conclusion that defendant shot" the officer. (*Id*. at pp. 802-803.) Furthermore, the Court observed, "[T]he cause of death was not actively contested at trial. Defense counsel, hoping to avoid exposing the jury to autopsy photographs and other evidence he considered to be inflammatory, offered to stipulate to the cause of death and the nature of the wounds." (*Id*. at p. 802.)

Similarly here, the cause of Balderrama's death, which Hernandez did not actively contest at trial, was sufficiently established by Reyes's description of the accident and eyewitness descriptions of the aftermath and Balderrama's condition at the scene.

Hernandez argues there *was* medical evidence in *Thomas*, describing the officer's wounds, which is lacking here. But *Thomas* gave no particular import to medical evidence, and did not hold it was essential to a causation inquiry. On the contrary, when summarizing "evidence that overwhelmingly supported" the finding of guilt, the Court discussed only the defendant's admission and eyewitness testimony, not the medical evidence.

No authority or principle holds that medical evidence is essential to establish that a defendant proximately caused a death.

Hernandez argues that other evidence failed to establish the cause of death: (1) accident scene photos of Balderrama's body, (2) that portion of Reyes's testimony to which a defense objection was sustained—that Balderrama died because his truck was struck from behind—and (3) defense counsel's implication during closing argument that the accident caused the death. But

25

again, our inquiry examines only whether substantial evidence supports the jury's finding. Once such evidence is found, the lack of confirming evidence is immaterial.

Hernandez argues that Reyes offered no pertinent testimony on the cause of her husband's death other than the statement which the court ordered stricken. We disagree. Although the court struck Reyes's testimony that Balderrama died because "Somebody who, apparently is driving under the influence—struck us," this was not her only pertinent testimony. Reyes also testified that Balderrama was alert and responsive immediately before the accident and nonresponsive immediately after it. This supported the reasonable inference that the accident caused his death.

Hernandez argues there was evidence that three seconds before the collision, Balderrama dropped his speed from 72 to 65 miles per hour, which may have been due to a fatal medical-related event. He argues that if such an event occurred, it would have constituted an intervening and superseding cause of Balderrama's death.

Although it is conceivable that a catastrophic medical event caused Balderrama to slow to the speed limit three seconds before the accident, no affirmative evidence indicates this occurred, and Reyes, who was talking to Balderrama at the time, observed nothing amiss. The jury was entitled to draw the much more reasonable inference that Balderrama, who habitually drove the speed limit, found himself exceeding it and momentarily took his foot off the gas pedal to compensate.

Hernandez also argues that *Reyes* held that the causation element requires that the act must involve a high degree of probability of death. We reject Hernandez's reading of *Reyes* as

to what is required to show proximate cause, as Hernandez has improperly conflated *Reyes*'s analysis of proximate cause with its analysis of the objective component of implied malice murder.

## B.    Jury Instruction on Implied Malice Murder

Hernandez argues that *Reyes* established a standard for the "actus reus/causation element" of implied malice murder, in which causation requires that the act in question carry "high degree of probability that it will result in death."  He argues that pursuant to this standard, a trial court must instruct that to find *causation*, the jury must find that the defendant's act involved a "high degree of probability" that it would result in death.  Hernandez further argues *Reyes* held that the *actus reus* of implied malice murder requires that the defendant did more than "merely create a dangerous situation in which death is possible depending on how circumstances unfold," and the jury should have been so instructed.  He argues the trial court here erred by failing to properly instruct the jury.

Lastly, Hernandez argues the jury should have been instructed that the act in question must be one involving a "high degree of probability that it will result in death."  (See *Reyes*, *supra*, 14 Cal.5th at p. 989.)

Hernandez, however, conflates two distinct elements of implied malice murder—actus reus and causation—and interchanges *Reyes*'s holding as to each element, improperly conflating *Reyes*'s analysis of proximate cause and the objective component of implied malice murder.  We conclude the trial court did not err in instructing the jury that in order to find implied malice, it must find the natural and probable consequences of the act were "dangerous to human life."

27

### 1. Relevant proceedings

As noted above, the court instructed the jury on second-degree murder pursuant to then-current CALCRIM No. 520, in pertinent part as follows:

"To prove that the defendant is guilty of [murder], the People must prove that, one, the defendant committed an act that caused the death of another person. And two, when the defendant acted, he had a state of mind called malice aforethought." The defendant had "[i]mplied malice if, one, he intentionally committed the act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life[;] and four, he deliberately acted with conscious disregard for human life."

### 2. Legal Principles

A trial court has a sua sponte duty to instruct the jury on all elements of any charged offenses. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) This duty extends to the general principles of law that govern the case, i.e., those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530.)

The California Supreme Court in *Knoller* acknowledged two lines of decisions describing the nature of the risk of the defendant's act. The first derives from Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*), which said malice is implied when the defendant for a base, antisocial motive and with wanton disregard for human life, " 'does an act that involves a *high degree of probability* that it will result in death.' " (*Knoller*, *supra*, 41 Cal.4th at p. 152, italics

28

added.)  The second line derives from *People v. Phillips* (1966) 64 Cal.2d 574, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, footnote 12, in which the Court stated that malice is implied when the killing is proximately caused by an act, "the natural consequences of which are dangerous to human life . . . .' " (*Phillips*, at p. 587.)

Our Supreme Court has repeatedly held that the *Thomas* and *Phillips* tests in essence articulate the same standard. (*Reyes*, *supra*, 14 Cal.5th at p. 989 ["under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death" ' "]; *Knoller*, *supra*, 41 Cal.4th at p. 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219-1222; *Watson*, *supra*, 30 Cal.3d at p. 300.)

After trial in this case, our Supreme Court decided *Reyes*, which involved an appeal from the denial of a section 1172.6 petition.  The petitioner, Reyes, accompanied a group of fellow gang members, one of whom had a gun, into rival gang territory, where the person with the gun shot and killed someone.  (*Reyes*, *supra*, 14 Cal.5th at p. 985.)  Reyes was convicted of second degree murder and later petitioned for resentencing under section 1172.6.  (*Id.* at p. 986.)  The trial court denied the petition, finding Reyes was guilty beyond a reasonable doubt of second degree murder.  (*Id.* at p. 987.)  The Court of Appeal affirmed, holding that the evidence established Reyes's guilt beyond a reasonable doubt.  (*Id.* at p. 987.)

In addressing how the conviction could not be sustained under a direct perpetrator theory, the Supreme Court held the evidence was insufficient to support the trial court's conclusion "that Reyes committed an act that 'proximately caused' [the

29

victim's] death." (*Reyes*, *supra*, 14 Cal.5th at p. 988.) The evidence "established that Reyes proceeded to an area on the edge of territory belonging to a rival gang and, alongside the other bikers, chased after [the victim's] car. But" the Court held, "acts that *merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement.* There was no evidence that Reyes's acts precipitated or provoked the shooting. And there is no reason to believe that the killing of [the victim] would not have occurred if Reyes had not accompanied his fellow gang members on the ride or participated in the chase." (*Id*. at p. 989, italics added.) The Court held that "Reyes's acts of bicycling into rival territory and chasing after [the victim's] car with [the shooter] and other fellow gang members were too attenuated in the chain of events to have proximately caused the killing; any causal link between Reyes's conduct and [the victim's] death is tenuous at best." (*Ibid*.)

After thus concluding that insufficient evidence demonstrated proximate cause, the Court "also [took] issue with the trial court's conclusion that '[t]he natural and probable consequences' of Reyes's *act* of traveling to rival gang territory with several other gang members, one of whom was armed, 'were dangerous to human life.' " (*Reyes*, *supra*, 14 Cal.5th at p. 989, italics added.) "To suffice for implied malice murder," the Court held, "the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Ibid*.) The court held that although it may have been likely that Reyes's act of entering rival gang territory with fellow gang members, one of whom was armed, "would result in some sort of gang

30

confrontation, and it is possible that someone would get hurt or killed," "the act [did] not by itself give rise to a high degree of probability that death [would] result." (*Ibid*.)

In March 2024, the Judicial Council modified CALCRIM No. 520. Under the modified instruction, implied malice murder requires that the defendant "committed an act that caused the death of [another person]" and "the natural and probable consequences of the act were dangerous to human life 'in that' the act involved a 'high degree of probability that it would result in death.' " (CALCRIM No. 520; see also Judicial Council of Cal. Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 520, p. 251; *People v. Doaifi* (Oct. 16, 2024, No. S286155) ___Cal.5th___ [2024 Cal. LEXIS 5774], at *1 (conc. opn. of Evans, J.).)

To summarize, *Reyes* held that proximate causation requires more than an act that "merely create[s] a dangerous situation in which death is possible depending on how circumstances unfold," and the act itself "must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " However, *Reyes* neither discussed any "actus reus/causation element" of implied malice murder, as Hernandez argues, nor held that *causation* requires that the act in question carry "high degree of probability that it will result in death." Neither did *Reyes* hold that the *actus reus* of implied malice murder requires a separate instruction that the defendant did more than "merely create a dangerous situation in which death is possible depending on how circumstances unfold." Therefore, the trial court did not err in refusing to instruct according to Hernandez's misreading of *Reyes*, in which he improperly

31

conflates the holding on proximate cause with the holding on the objective component of implied malice.

Finally, for purposes of the jury instruction on implied malice, *Reyes* did not differentiate between the terms "dangerous to human life" (the *Phillips* test) and "an act that involves a high degree of probability that it will result in death" (the *Thomas* test). On the contrary, *Reyes* stated that "under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

We conclude that the court properly instructed the jury with the then-current version of CALCRIM No. 520, which remains a correct statement of the law notwithstanding its later clarification in *Reyes*.[3]

## C.    Sentence Credits

Hernandez argues the trial court miscalculated his presentence custody credits. Respondent concedes the point, and we agree.

A defendant is entitled to actual custody credit for all days in custody in county jail, including partial days, from the day of arrest through the day of sentencing. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) A person convicted of murder or involuntary manslaughter may accrue no more than 15 percent of worktime credit. (§ 2933.1.) " 'A sentence that fails to award legally mandated custody credit is unauthorized and may be

---

[3] To be sure, post-*Reyes*, a trial court would be well advised to instruct a jury with the newly modified CALCRIM No. 520.

32

corrected whenever discovered.' " (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)

Here, the collision occurred on July 16, 2021, and Hernandez was arrested the same day. He was held in custody throughout the criminal proceedings and was sentenced on August 16, 2023, 762 days after his arrest, and was entitled to good time/work time credit of up to 15 percent of his actual custody credits, or 114 days. The court awarded only 732 days of actual custody credit and 109 days of good time/work time credit. We will therefore order that the judgment be corrected.

## DISPOSITION

The judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect 762 days of actual custody credit and 114 days of conduct/work credit, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

33